724 F.Supp. 1038 (1989)
ROCHESTER PURE WATERS DISTRICT, et al., Plaintiffs,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Defendant.
Civ. A. No. 89-2820.
United States District Court, District of Columbia.
November 13, 1989.
*1039 Christopher L. Rissetto, Zorc, Rissetto, Weaver & Rosen, Washington, D.C., for plaintiffs.
Carl Strass, Environmental Defense Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

*1040 MEMORANDUM OPINION AND ORDER
JOYCE HENS GREEN, District Judge.
Plaintiffs Rochester Pure Waters District and the City of Rochester (collectively "Rochester") filed the instant complaint on October 13, 1989 seeking to require defendant United States Environmental Protection Agency ("EPA") to preserve and set aside $3,986,884 out of a total of $47,700,000 of unobligated federal funds which were appropriated to the EPA under the Clean Water Act ("CWA") Section 206 grant reimbursement program[1] pending final resolution of plaintiffs' administrative appeal with the EPA in which plaintiffs' entitlement to the $3,986,884 is in dispute. At the time the lawsuit was filed, Congress had pending bills that had passed both houses and was under consideration by a Conference Committee which included a provision rescinding the unexpended $47,700,000. In the face of this imminent Congressional action, plaintiffs filed the instant action, seeking to preserve the disputed $3,986,884 pending resolution of their administrative appeals. On October 13, 1989, this Court granted plaintiffs' motion for a temporary restraining order and directed EPA to set aside and preserve the disputed funds until November 15, 1989. Since that date, both the Senate and House have passed a bill rescinding the $47,700,000.
Presently pending before the Court is plaintiffs' motion for a permanent injunction.[2] For the reasons set forth below, plaintiffs' motion is granted.

I. BACKGROUND

A. Statutory Background
In 1956 Congress passed the Federal Water Pollution Control Act ("FWPCA"),[3] to address the problem of increasing levels of pollution in this country's waterways. Section 8 of the FWPCA provided federal assistance to eligible public treatment works to offset the costs of upgrading treatment facilities that were needed to abate pollution by reimbursing recipients up to thirty percent of eligible costs incurred during construction.[4]
In 1972 Congress enacted the Federal Water Pollution Control Act Amendments of 1972, commonly known as the Clean Water Act ("CWA").[5] In addition to creating the current regulatory scheme for abatement of pollution to this country's waterways, the CWA greatly expanded federal grant participation in constructing public facilities needed to treat wastewater. This program, the Title II construction grant program,[6] increased the federal government's reimbursement to seventy-five percent of the costs of construction.
The funding scheme created by the CWA created serious inequities in that public treatment facilities which initiated improvement measures under the Section 8 program received less federal assistance than those which waited until the Title II program was passed, in effect rewarding those facilities who delayed implementation of needed pollution control strategies. Congress enacted CWA Section 206 to partially remedy these funding inequities. Under Section 206, eligible Section 8 grantees were entitled to a federal grant increase up to fifty-five percent of the eligible project costs.[7] Congress initially authorized $2 billion for this program[8] and further provided that an applicant under Section 206 could revise the project cost estimate from time to time, as was necessary.[9]
Of the $2 billion authorized, Congress appropriated $1.9 billion to the Section 206 *1041 program.[10] In order for the Section 8 grantees to claim the $1.9 billion then appropriated, applications were required to be filed by January 31, 1974.[11] The following year, 1973, Congress authorized an additional $600 million.[12] In an effort to close the gap between the authorized and appropriated amounts, Congress appropriated an additional $200 million for the Section 206 program in 1976[13] and another $300 million to the program in 1977.[14] No application deadline was set forth in either legislation.

B. Rochester's Grant Awards
On January 10, 1968, EPA awarded a Section 8 construction grant in the amount of $1,948,000 to the City of Rochester for the VanLare Treatment Plant. The Section 8 grant was subsequently increased to a total of $21,919,500 to reimburse Rochester for total project costs of $78,940,000.[15] Rochester timely applied for and received a Section 206 grant in the amount of approximately $43,472,000, which represented the maximum allowable fifty-five percent grant entitlement of the then estimated project costs of $79,040,000.[16]
After the January 31, 1974 cutoff date for applications under Section 206, Rochester defended separate lawsuits initiated by its prime contractor on the VanLare Treatment Plant, Monsanto Enviro-chem, and its electrical subcontractor, Vinderlinde Electrical Corporation. Rochester eventually settled the Monsanto litigation for $5 million and the Vinderlinde litigation for $750,000.[17]
On October 11, 1984, Rochester requested a grant increase under Section 206(c)[18] to reimburse Rochester for the federal statutory share of the settlement agreements. Through this request, Rochester sought reimbursement of $3,986,884 which resulted from its defense of the Monsanto and Vinderlinde litigation, claiming entitlement to the funds as a revision pursuant to 33 U.S.C. § 1286(c). Rochester presented the request to the New York State Department of Environmental Conservation ("NYDEC"), EPA's delegated agent for purposes of administering the construction grants program.[19] On December 19, 1984, Rochester's request was denied because "[t]he eligible amount claimed in the reimbursement application prior to January 31, 1974 is a firm ceiling which cannot be exceeded according to the Federal Regulations governing reimbursement."[20] Rochester subsequently requested NYDEC reconsideration.[21] On December 12, 1986, NYDEC again rejected Rochester's request holding that the January 31, 1974 cutoff date was an absolute ceiling for funding purposes.[22] Rochester's subsequent appeals, pursued in accordance with the applicable administrative scheme, were rejected.[23] On August 4, 1987, NYDEC issued its final determination, concluding that the January 31, 1974 application amount was the maximum possible reimbursement cost.[24] On September 4, 1987, Rochester requested EPA, Region II, to review NYDEC's denial of Rochester's request for a federal grant increase.[25] That appeal is still pending. On September 13, 1989, Rochester submitted to EPA a Deviation Request, pursuant to 40 C.F.R. Part 30, *1042 Subpart J, requesting that EPA approve a deviation from its regulations to allow funding for Rochester's settlement costs submitted after January 31, 1974. That request is also pending.

C. Rescission by Congress of the Section 206 Funds
Approximately $47,700,000 of appropriated funds for the CWA Section 206 program have not been obligated by the EPA. In June 1989, EPA was asked by the staff of the House Committee on Appropriations to provide information and general comments regarding a potential rescission of these funds.[26] EPA examined data from its Regional Offices and concluded that no one would be adversely impacted by a rescission under applicable EPA regulations.[27] EPA subsequently advised the House committee staff that EPA did not believe anyone would be adversely affected by the rescission.[28] On July 20, 1989, the House appropriations bill for EPA, H.R. 2916, which provided for a rescission of the $47.7 million, was passed. The House Report stated that EPA had indicated that the rescission "will cause no adverse impacts." H.R.Rep. No. 101-150, 101st Cong. 1st Sess. 49 (1989).
EPA did not initially inform the House Committee staff of Rochester's pending reimbursement grant claim, although it had been pending for two years with EPA, asserting that EPA first learned of it in early September, 1989, in a phone call from the staff of a senator.[29] EPA confirmed that Rochester's claim was pending in Region II and subsequently informed the congressional staff that although the administrative appeal was pending, EPA did not believe that Rochester was eligible for the reimbursement because the costs were submitted after the 1974 deadline.[30] EPA officials advised the Senate appropriations committee staff that EPA had some difficulties with the proposed rescission because there was a pending claim.[31] The Senate staff indicated that it was aware of the issue and the pending claim.[32]
Despite Rochester's active claim, the Senate passed H.R. 2916 on September 28, 1989, which contained a provision identical to the one in the House bill rescinding $47.7 million in Section 206 funds. On or about September 28, 1989, EPA advised the House committee staff that Rochester had raised to EPA an issue regarding the 1974 deadline in EPA's regulations which had not been previously considered by the director of the construction grant program office and which would be considered in the administrative appeal process.[33]
On October 13, 1989, the same day that this Court entered a temporary restraining order directing the EPA to set aside and preserve the disputed funds, EPA officials called the House committee staff and notified them of the instant lawsuit and the likelihood that a restraining order would be issued.[34] Rebecca W. Hamner, EPA's Acting Assistant Administrator for Water, also spoke to a staff member, advising that EPA had no policy objection if Congress withheld $4 million from the rescission pending completion of Rochester's appeal but that if the $4 million were rescinded, one option would be to seek additional funds from Congress should Rochester succeed in the appeal.[35] Nonetheless, on October 18, 1989, the Conference Committee reported a bill that contained the same rescission provision as the House and Senate *1043 bills.[36] The Conference bill was sent to both Houses of Congress, which recently passed the bill and forwarded it to the President for signature.[37] Without the present injunction (due to expire November 15, 1989) and a permanent one, once this bill becomes law, the $47.7 million of unexpended budget authority will be rescinded and no longer be available to EPA for disbursement to Section 206 grantees.

II. DISCUSSION
Through the instant lawsuit, plaintiffs do not seek an adjudication of their entitlement to the $3,986,844 presently in dispute in the EPA administrative appeals process. Rather, plaintiffs ask this Court to exercise its inherent equitable powers to preserve these funds so that meaningful relief will be available to plaintiffs should they prevail on the merits of their administrative appeals.
Pointing to a line of cases from this circuit, plaintiffs argue that courts traditionally issue preliminary injunctions to avoid the lapse of budgetary authority pending a hearing regarding the lawfulness of the agency's action provided the lawsuit is filed prior to the statutory lapse date. See Jacksonville Port Authority v. Adams, 556 F.2d 52, 55-56 (D.C.Cir.1977); State of Connecticut v. Schweiker, 684 F.2d 979, 997 (D.C.Cir.1982) ("This court has repeatedly reaffirmed the power of the courts to order that funds be held available beyond their statutory lapse date if equity so requires"), cert. denied, 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983); West Virginia Ass'n of Community Health Centers v. Heckler, 734 F.2d 1570, 1576-77 (D.C.Cir.1984) ("an equitable doctrine has been fashioned by the federal courts in recent years to permit funds to be awarded to a deserving plaintiff even after the statutory lapse date, as long as the lawsuit was initiated on or before that date") (citations omitted); National Ass'n of Regional Councils v. Costle, 564 F.2d 583, 588-89 (D.C.Cir.1977).
Plaintiffs argue that they are entitled to a meaningful grant appeals process which can only be guaranteed if an adequate remedy exists should plaintiffs ultimately succeed on the merits of their administrative appeals. Indeed, should the disputed funds be rescinded prior to a final agency decision, any future victory that plaintiffs secure at the administrative level would be a hollow one.
As explained below, the Court agrees with plaintiffs that injunctive relief is warranted here to ensure that plaintiffs will have an adequate remedy should they prevail on their administrative appeals. In reaching this conclusion, the Court expresses no opinion as to the merits of those pending appeals.
In opposing plaintiffs' motion for permanent injunction, EPA raises several arguments. Each is without merit.

A. Jurisdiction
EPA first argues that this Court lacks jurisdiction over plaintiffs' complaint. EPA asserts that the real federal action being challenged here is not any action by EPA, but rather the potential action by Congress in rescinding the $47.7 million in unobligated Section 206 funds. Because, according to EPA, there has been no waiver of sovereign immunity, EPA asserts that plaintiffs' action must be dismissed.
EPA attempts to characterize the instant action as a suit for negligent actions by administrative personnel, a "misgovernment" case. EPA construes plaintiffs' complaint as a challenge based on EPA's initial error in failing to discover and timely inform the House Appropriations Committees that Rochester had a pending administrative appeal with respect to a portion of the $47.7 million of Section 206 funds that Congress was considering rescinding.[38] *1044 EPA contends that Congress has prohibited such suits by passing the Federal Tort Claims Act, which contains a limited waiver of sovereign immunity but prohibits suits for damages caused by federal employees performing discretionary functions.
Despite EPA's insistence to the contrary, this case is not a "misgovernment" case. Rochester's complaint is not grounded solely upon EPA's error in initially failing to inform Congress of Rochester's pending appeal. Rather, Rochester is concerned with the irreparable harm it faces should the EPA refuse to obligate Section 206 funds or process Rochester's pending appeals prior to Congress' rescission of its budgetary authority. The Federal Tort Claims Act is not a bar to this Court's review.[39]
Next, EPA argues that this suit is prohibited by the Tucker Act, 28 U.S.C. §§ 1346(a)(2) and 1491, which bars district court actions, based upon statute, regulation, or contract, where the claim is for money in excess of $10,000, and that exclusive jurisdiction lies in the Claims Court. Once again, EPA misses the mark. Plaintiffs are not seeking money damages in this action. Rather, they are seeking injunctive relief requiring EPA to preserve nearly $4 million in unobligated funds appropriated under Section 206 until the resolution of their administrative appeals. That money is involved does not change the character of this case from equitable to legal in nature. See Bowen v. Massachusetts, 487 U.S. 879, 108 S.Ct. 2722, 2731-32, 101 L.Ed.2d 749 (1988) (plaintiff seeking injunction correcting an allegedly unlawful disallowance of a federal Medicaid grant states an equitable, rather than legal, claim). Our court of appeals has repeatedly recognized that district court review of the type of action at issue here is appropriate and not barred by the Tucker Act. See Esch v. Yeutter, 876 F.2d 976, 977-83 (D.C. Cir.1989) (plaintiff seeking injunction to prevent Secretary of Agriculture from denying farm subsidy benefits); National Ass'n of Counties v. Baker, 842 F.2d 369, 372-77 (D.C.Cir.1988) (plaintiffs seeking declaratory and injunctive relief to compel Secretary of Treasury to release funds appropriated under Revenue Sharing Act), cert. denied, ___ U.S. ___, 109 S.Ct. 784, 102 L.Ed.2d 775 (1989); Maryland Department of Human Resources v. Department of Health & Human Services, 763 F.2d 1441, 1446-51 (D.C.Cir.1985) (plaintiff seeking declaratory and injunctive relief to prevent defendants from reducing funds due to plaintiff under Title XX of Social Security Act).[40]
Finally, EPA contends that the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., does not provide a waiver of sovereign immunity. According to EPA, the APA does not offer a basis for attack against congressional action, which EPA asserts is at issue here. Nor does the APA permit Rochester to challenge EPA, defendant contends, because EPA has not taken any final agency action subject to APA review. EPA's argument is unavailing. As to EPA's first argument, Rochester is not challenging congressional action and this Court's exercise of its equitable powers to preserve these funds does not interfere with Congress' exclusive power to appropriate funds. See, infra, II.B. As to EPA's second argument, Jacksonville Port Authority, Schweiker, West Virginia Ass'n of Community Health Centers, and National Ass'n of Regional Councils make clear that district courts have jurisdiction in cases such as this, where injunctive relief is sought to suspend a reversion of previously appropriated funds back to the federal Treasury, so long *1045 as the suit is filed prior to the reversion date. That EPA has not taken any final agency action does not therefore prevent district court review under these circumstances. An analogous situation arose in Schweiker, where plaintiffs sought reimbursement for expenditures they incurred in operating various programs under the Social Security Act. At issue in Schweiker was a rule issued by the Department of Health and Human Services which barred payment of certain funds to which plaintiffs claimed entitlement. Plaintiffs filed their complaint two days before the final rule was published, seeking to reserve a portion of otherwise unobligated funds for fiscal year 1981 in the event that they succeeded on their pending claims. Recognizing plaintiffs' precarious position, our court of appeals had no difficulty concluding that it had the power to hear plaintiffs' claim:
Appellants could not have been expected to file suit earlier than they did because HHS had not yet issued a final rule barring payment of the disputed claims. As it was, appellants filed suit two days before the final rule was published. Had they done so earlier, their suit would probably have been dismissed as premature, on the ground that HHS could still provide complete relief in a final rule.
Schweiker, 684 F.2d at 998. Had plaintiffs in Schweiker waited until after the end of the fiscal year, the funds would have lapsed and reverted back to the Treasury, leaving plaintiffs with no adequate remedy.
Like Schweiker, forcing plaintiffs here to await final agency action in the face of the imminent congressional rescission of the $47.7 million of unobligated Section 206 funds would leave them without an adequate remedy. Plaintiffs are in a classic "Catch-22." If they wait for final agency action, the disputed funds would be rescinded, leaving them without a source of funds should they ultimately prevail on their administrative appeals. On the other hand, should they file suit prior to the rescission, as they in fact have done, they face the argument raised by EPA here, that there is no final agency action for this court to review. As illustrated by Schweiker and the other cases from this circuit, district court review under such circumstances is entirely appropriate.
Furthermore, the more than four year delay in the processing of plaintiffs' administrative appeals (including the two year delay directly at EPA) should not be laid entirely at plaintiffs' feet. Plaintiffs have not slept on their rights. They have pursued their appeals through the multi-leveled review process at both the state and federal level pursuant to EPA regulation. They should not be penalized for EPA's inefficient and lengthy appeals process. Had EPA resolved this matter expeditiously, plaintiffs would not find themselves in their present position. If EPA had resolved the appeals in plaintiffs' favor, plaintiffs would have their Section 206 funds; if EPA had ruled against plaintiffs, there would be a final agency action from which plaintiffs could seek judicial review.
As the case law makes clear, once the statutory lapse date, or in this case, the date of rescission, passes, the disputed funds revert back to the Treasury and are no longer available for obligation. Plaintiffs waited as long as could reasonably be expected to file suit. Under these circumstances, EPA's argument that this Court lacks jurisdiction borders on frivolity.[41]

B. Congressional Appropriations Power
EPA also characterizes this case as a "preemptive effort to override an act of Congress calling for the return of $48 million to the federal Treasury."[42] EPA argues that Congress, which has exclusive power under Article I, § 8, cl. 1 and Article I, § 9, cl. 7 of the United States Constitution *1046 to control the appropriation of federal funds, therefore has "exclusive power to decide whether or not to fund the Clean Water Act reimbursement grants program, and whether to rescind funding, even in the midst of the judicial or administrative process."[43] EPA asks this Court to characterize the instant action as an effort to prevent Congress from exercising its power of rescinding previously appropriated funds and asserts that no person has power to bring suit to prevent legislation.
Not only does EPA mischaracterize the nature of this case, it ignores the fact that this same argument was specifically rejected by our court of appeals in Schweiker:
We have made it clear that the power to prevent the statutory lapse or reversion of an agency's budget authority does not conflict with Congress' exclusive power to appropriate funds.
Schweiker, 684 F.2d at 997. Citing National Ass'n of Regional Councils, 564 F.2d at 588, the Schweiker court further explained:
Decisions that a court may act to prevent the expiration of budget authority which has not terminated at the time suit is filed are completely consistent with the accepted principle that the equity powers of the courts allow them to take action to preserve the status quo of a dispute and to protect their ability to decide a case properly before them. In such situations, the courts simply suspend the operation of a lapse provision and extend the term of already existing budget authority.
Id.[44]
The critical element in these budgetary lapse decisions is whether plaintiffs filed their lawsuit prior to the lapse of the budget authority. See id. In the instant case, Rochester filed suit on October 13, 1989 and, with the express consent of all parties, this Court granted plaintiffs temporary injunctive relief until November 15, 1989 by which time a final decision would be rendered as to permanent injunctive relief. On the date of these actions, Congress had not rescinded the $47.7 million in unobligated Section 206 funds and EPA therefore still had authority to obligate these funds. Accordingly, the exercise of this Court's equitable powers to preserve these funds pending resolution of plaintiffs' underlying claims does not conflict with Congress' power to appropriate funds.[45]

C. Available Relief
It is EPA's position that even assuming, arguendo, that Rochester ultimately prevails on the merits of its administrative appeals, sufficient funds will be available to satisfy Rochester's funding requests. In advancing this argument, EPA relies primarily on a Conference Report which, according to EPA, assures that Rochester is not left without a source of *1047 funds. This Court does not share EPA's confidence. The Conference Report upon which EPA relies states:
The conferees want to emphasize that the inclusion of the bill language rescinding $47,700,000 of section 206(a) funds should not prejudice EPA's consideration of appeals by Rochester, NY and other cities. The conferees urge the Administration to make a final determination on pending section 206(a) appeals as soon as possible and report the results to the Committees on Appropriations. If the appeals are approved, the conferees expect the Agency to assist the municipalities by identifying in its report to Congress the options available and administrative steps required for payment, including current construction grants appropriations and the claims and judgment fund.
135 Cong.Rec. H7210.
This is a far cry from an absolute guarantee that sufficient funds will be available should plaintiffs prevail in their underlying claims after the rescission occurs. The "wait-and-see" approach advanced by EPA and Congress in no way ensures that the nearly $4 million now in dispute will be available once plaintiffs have exhausted their administrative appeals. Indeed, when asked at oral argument whether sufficient funds would be available from EPA from some source after rescission of the $47.7 million should Rochester prevail at the administrative level, EPA could not point to any specific source of such funds nor guarantee that they would in fact be available. In addition, given that EPA has not indicated how long it will be before final agency action is taken on Rochester's administrative appeals, EPA's argument that relief will be available after the funds are rescinded is questionable at best.

D. Vested Right to Disputed Funds
EPA also contends that Rochester does not have any vested right to the additional grant funds it seeks. Relying on Missouri Health & Medical Organization, Inc. v. United States, 641 F.2d 870, 874-75, 226 Ct.Cl. 274 (1981) and National Consumer Information Center v. Gallegos, 549 F.2d 822, 827-28 (D.C.Cir.1979), EPA asserts that, at most, Rochester has an "expectation" of an enlargement of its federal grant, which Congress may terminate as it sees fit. These cases are inapposite. In these cases, the grantees did not have any cognizable interest because the grants at issue for which funding was denied were renewal grants. In the instant case, however, Rochester is not seeking a new or renewal grant. Rochester originally received a Section 8 grant and then timely applied for and received a reimbursement grant under Section 206 of the CWA. Through its instant appeals at EPA, Rochester is seeking its entitlement to funds under Section 206 through a revision of its approved application as it is entitled to do pursuant to 33 U.S.C. § 1286(c). At issue in the administrative appeals is whether Rochester is entitled to these additional funds under its existing Section 206 grant.[46] The cases cited by EPA are therefore not a bar to the instant action.

III. CONCLUSION
In sum, and to reiterate, the cases from this circuit, specifically, Jacksonville Port Authority, Schweiker, West Virginia Ass'n of Community Health Centers, and National Ass'n of Regional Councils provide undisputed support for the injunctive relief plaintiffs seek here. Plaintiffs filed suit prior to the rescission of the nearly $4 million unobligated Section 206 funds presently in dispute in their administrative appeals at EPA. It is clearly within this Court's equitable power to suspend rescission of these disputed funds (and only these disputed funds) pending final resolution of plaintiffs' underlying claims. Such *1048 power does not interfere with Congress' exclusive power to appropriate funds.

Form of Relief
When this Court granted plaintiffs' motion for a temporary restraining order on October 13, 1989, EPA was directed to set aside and preserve $3,986,884 of the funds appropriated to the Section 206 grant reimbursement program until the Court issued a decision (no later than November 15, 1989) with respect to plaintiffs' motion for permanent injunction. In this latter motion, plaintiffs request that these funds be transmitted to the Court until their appeals are concluded. This request shall be denied. As provided in the following Order, EPA, rather than the Court, shall hold the disputed funds pending a final decision on plaintiffs' administrative appeals. It clearly behooves all parties to see that these administrative appeals are resolved as expeditiously as possible.

ORDER
For the reasons set forth above, it is accordingly hereby
ORDERED that plaintiffs' motion for permanent injunction is granted and defendant United States Environmental Protection Agency shall set aside and preserve $3,986,884 of funds appropriated to the Clean Water Act § 206 grant reimbursement program, 33 U.S.C. § 1286, which funds are the subject of (1) Rochester's September 4, 1987 pending administrative appeal with EPA, Region II and (2) Rochester's September 13, 1989 pending Deviation Request with EPA. This injunction shall remain in full force and effect until EPA has taken final agency action on these two matters.
IT IS SO ORDERED.
NOTES
[1] 33 U.S.C. § 1286.
[2] By consent of the parties, plaintiffs' motion for a preliminary injunction was converted to a motion for permanent injunction so that a final resolution of this matter could be expeditiously reached. See Order, October 13, 1989, p. 1.
[3] Codified at 33 U.S.C. § 1151 et seq.
[4] Section 8 was codified at 33 U.S.C. § 1158.
[5] Codified at 33 U.S.C. § 1251 et seq.
[6] Codified at 33 U.S.C. § 1281 et seq.
[7] See 33 U.S.C. § 1286(a).
[8] See Pub.L. No. 92-500, Oct. 18, 1972.
[9] See 33 U.S.C. § 1286(c).
[10] See Pub.L. No. 92-399, Aug. 22, 1972.
[11] See Pub.L. No. 93-207, §§ 2, 3.
[12] See Pub.L. No. 93-207, Dec. 28, 1973.
[13] See Pub.L. No. 94-378, Aug. 9, 1976.
[14] See Pub.L. No. 95-29, May 13, 1977.
[15] See Affidavit of John M. Davis, P.E., Director of Engineering, County of Monroe, N.Y. ("Davis Aff."), ¶¶ 4-7. (attached as exhibit 1 to plaintiffs' motion for preliminary injunction).
[16] Id. ¶¶ 8-9.
[17] See id. ¶¶ 10-31.
[18] Codified at 33 U.S.C. § 1286(c).
[19] Id. ¶ 32.
[20] Id. ¶ 33; see also Pl.Ex. 2.
[21] Pl.Ex. 3.
[22] Id. ¶ 36; see also Pl.Ex. 5.
[23] Id. ¶¶ 37-40.
[24] Id. ¶ 40; see also Pl.Ex. 9.
[25] Id. ¶ 41; see also Pl.Ex. 10.
[26] Declaration of Richard M. Brozen, Acting Director of the Budget Division, Office of Comptroller, EPA ("Brozen Decl."), ¶ 3; Declaration of Michael J. Quigley, Acting Deputy Assistant Administrator for Water and Director of the Office of Municipal Pollution Control, EPA ("Quigley Decl."), ¶ 3.
[27] Quigley Decl., ¶¶ 4-5.
[28] Id. ¶ 6.
[29] Id. ¶ 7.
[30] See id.
[31] Brozen Decl., ¶ 5.
[32] Id.
[33] Quigley Decl., ¶ 9.
[34] Brozen Decl., ¶ 7.
[35] Declaration of Rebecca W. Hamner ("Hamner Decl."), ¶ 3.
[36] See 135 Cong.Rec. H7210.
[37] EPA believes that the House passed the Bill on Tuesday, October 31, 1989, and that the Senate passed the Bill on Friday, October 27, 1989. See EPA's Corrected Notice of Passage of Legislation, filed November 2, 1989.
[38] EPA admits that it did initially mistakenly advise Congress that termination of the reimbursement grants program would not prejudice any municipality.
[39] Interestingly, plaintiffs never asserted that jurisdiction was founded upon the Federal Tort Claims Act.
[40] Indeed, the underlying appeal at the EPA is itself not for "money damages" as that term has been consistently interpreted by this circuit. In their administrative appeal, plaintiffs are seeking funds to which a statute allegedly entitles them. Bowen, Esch, Nat'l Ass'n of Counties, and Maryland Department of Human Resources make clear that the APA provides the requisite waiver of sovereign immunity for such actions and that review in district court is appropriate.
[41] It is also incredible that despite the fact Rochester's appeals have been pending with EPA since 1987, EPA inexplicably failed to discover them until two months ago. EPA did not inform Congress of Rochester's appeals until after the House appropriations bill for EPA, H.R. 2916, which provided for a rescission of the $47.7 million, was passed.
[42] Dispositive Memorandum for the United States, Pursuant to Court Order, and in Support of Summary Judgment ("Opp."), p. 10.
[43] Opp., at 12.
[44] In the typical "budgetary lapse" case, appropriated funds automatically revert to the federal Treasury at the end of the fiscal year if they have not been obligated. While this case is arguably different from the typical budgetary lapse case in that Congress is seeking to pass legislation to rescind the unobligated Section 206 funds, this distinction is irrelevant. That the funds will revert to the federal Treasury here by a different mechanism is of no importance. Congress is responsible for the reversion of the funds in both instances. The reasoning of the budgetary lapse cases such as Jacksonville Port Authority, Schweiker, West Virginia Ass'n of Community Health Centers, and National Ass'n of Regional Councils applies with equal force here. The argument raised by EPA that an injunction would interfere with Congress' power of appropriation is no more compelling here, where Congress seeks to rescind unobligated funds, than it is in the typical budgetary lapse case, in which unobligated funds revert automatically at the end of a fiscal year. The budgetary lapse cases have made clear that the type of injunctive relief sought by the instant plaintiffs does not interfere with Congress' appropriation power. For the same reasons, where as here, Congress is seeking to rescind unobligated funds, an injunction which sets aside and preserves funds in dispute does not interfere with Congress' power.
[45] 31 U.S.C. § 1502(b) belies EPA's argument. That section provides:

A provision of law requiring that the balance of an appropriation or fund be returned to the general fund of the Treasury at the end of a definite period does not affect the status of lawsuits or rights of action involving the right to an amount payable from the balance.
[46] Champaign County, Illinois v. United States Law Enforcement Assistance Administration, 611 F.2d 1200 (7th Cir.1979), upon which EPA also relies, does not compel a contrary result. There, the court concluded that a grant had never been awarded to the plaintiff because there was no written evidence, as required by law, of an agreement between the grantor and plaintiff. Here, by contrast, Rochester has an existing Section 206 grant which it is, in part, seeking to revise as it is entitled by statute to do.