ROCHESTER PURE WATERS DISTRICT, a Municipal Authority of the State of New York, et al.

v.

ENVIRONMENTAL PROTECTION AGENCY, Appellant.

Nos. 90–5011, 90–5320.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 29, 1990.

Decided April 3, 1992.

John J. Roberts, Jr., Attorney, U.S. Dept. of Justice, Washington, D.C., for appellant. Richard B. Stewart, Asst. Atty. Gen., Carl Strass, Peter R. Steenland, Jr., David C. Shilton, and Apphia T. Schley, Attorneys, U.S. Dept. of Justice, and E. Donald Elliott, General Counsel, Environmental Protection Agency ("EPA"), and Stephen G. Pressman, Attorney, EPA, Washington, D.C., were on the brief, for appellant.

Joseph M. Zorc, with whom Christopher L. Rissetto and Ronald L. Raider, Washington, D.C., were on the brief, for appellees.

Before BUCKLEY, WILLIAMS, and THOMAS,* Circuit Judges.

Opinion PER CURIAM.

PER CURIAM:

■ May a federal court order an executive agency to set aside funds from an appropriation that Congress has rescinded? In this case, the district court issued a temporary restraining order mandating that the Environmental Protection Agency retain approximately $4 million of the $47.7 million remaining in an appropriation for a grant program. Congress rescinded the entire $47.7 million after the court issued its order. Relying on case law dealing with the extension of lapsed budget authority, the court answered the question posed above in the affirmative by converting its temporary restraining order into a permanent injunction after the rescission. We are not persuaded by the analogy to a lapsed appropriation. A federal court cannot, consistent with the Constitution, overturn a rescission by Congress in order to preserve the positions of the parties in an ongoing dispute. To do so would allow the court to appropriate funds. That is the job of Congress. Therefore, we reverse.

## I. BACKGROUND

The Rochester Pure Waters District and the City of Rochester, New York (collectively "Rochester"), are embroiled in a long-standing dispute with the Environmental Protection Agency over funding for the construction of a sewage treatment plant. In 1968, the EPA awarded Rochester a $1,948,000 grant to help build a plant pursuant to section 8 of the Federal Water Pollution Control Act. That section established a program under which the Federal Government was authorized to provide up to thirty percent of the eligible costs of water pollution abatement projects. See 33 U.S.C. § 466e (1964), Pub.L. No. 89–753, § 203, 80 Stat. 1246, 1248–49 (1966). By June 1972, the EPA had increased Rochester's grant to a total of $19,776,700, representing twenty-five percent of the total costs.

In October 1972, Congress enacted the Federal Water Pollution Control Act Amendments, which brought about significant changes in the law. In addition to creating the heart of the current federal water pollution programs, the Amendments greatly increased federal funding for quali-

---

* Former *Circuit Judge* THOMAS, now an Associate Justice of the Supreme Court of the United States, was a member of the panel when the case was argued but did not participate in this decision.

fied pollution abatement projects. The Amendments established a new program through which municipalities could recover up to seventy-five percent of construction costs. 33 U.S.C. § 1281 *et seq.* (1988). Congress also authorized additional reimbursements to section 8 grantees that had instituted approved projects between June 1966 and July 1973, up to a total of fifty-five percent of eligible construction costs. *See id.* § 1286(a) ("section 206(a)"). The Amendments required that applications for the upward adjustments be filed within a one-year window commencing on October 18, 1972. Applicants filing within this window were allowed to revise their claims "from time to time, as may be necessary." *Id.* § 1286(c).

Congress appropriated $1.9 billion for the section 206(a) program in 1972. *See* Pub.L. No. 92–399, 86 Stat. 591 (1972). The next year, Congress extended the application deadline until January 31, 1974. *See* Pub.L. No. 93–207, 87 Stat. 906 (1973). In 1976 and 1977, a further $500 million was added to the section 206(a) appropriation.

Rochester filed a timely application for additional funds. The city and the district sought an increase to cover fifty-five percent of the project's total cost of approximately $79 million, which the EPA granted. All together, the EPA provided Rochester with grants totalling $43,472,000.

Over ten years after the expiration of the filing deadline, Rochester applied to the EPA for an additional $3,986,884 to cover the costs of settling lawsuits with the project's prime contractor and a subcontractor. The New York Department of Environmental Conservation, the EPA's delegated agent for the section 206(a) program, denied the request in December 1984, holding that an applicant could not receive more than the amount claimed prior to the statutory deadline of January 31, 1974. *See Rochester Pure Waters Dist. v. EPA,* 724 F.Supp. 1038, 1041 (D.D.C.1989) ("*Rochester*"). After this denial, Rochester diligently pursued its administrative remedies with the state agency and the EPA. In September 1989, Rochester also filed a Deviation Request with the EPA,

pursuant to 40 C.F.R. Part 30, in which it sought a departure from the agency's regulations. *Id.* at 1041–42.

In the meantime, while these administrative appeals were pending, Rochester became concerned that while it might win the administrative battles, the EPA might lose the funds with which to satisfy the additional claim. By 1989, only $47.7 million of the $2.4 billion appropriated for section 206(a) remained unobligated. In June 1989, the staff of the House Committee on Appropriations contacted the EPA and asked for data and comments regarding the possible rescission of the $47.7 million. The EPA replied shortly thereafter that it believed no one would be adversely affected by the proposed step. *Id.* at 1042. On July 20, 1989, the House of Representatives passed a bill appropriating funds for a variety of agencies, including the EPA, for fiscal year 1990. That legislation included the rescission of the full $47.7 million in section 206(a) funds. The committee report accompanying the bill stated that the EPA "indicate[d] that this rescission will cause no adverse impacts." H.R.Rep. 101–150, 101st Cong., 1st Sess. 49 (1989).

In early September 1989, the EPA's Acting Deputy Assistant Administrator of Water was informed of Rochester's claim. *See* Quigley Affidavit ¶ 7, *reprinted in* Joint Appendix ("J.A.") at Tab 5. As a consequence, the agency advised the Senate Appropriations Committee staff on September 11 that "EPA had some difficulties with the proposed rescission because there was a pending administrative claim for section 206(a) funds." Brozen Affidavit ¶ 5, *reprinted in* J.A. at Tab 4. Senate committee staff members acknowledged that they were aware of the claim. *Id.* Nevertheless, the Senate subsequently passed its version of the fiscal year 1990 appropriations bill, which included the identical rescission proviso.

On October 13, 1989, Rochester filed this action in the district court to require the EPA to preserve and set aside the nearly $4 million needed to cover its claim and requested a temporary restraining order ("TRO"). The court granted the order the

same day and directed the agency to preserve the monies until November 15. *Rochester*, 724 F.Supp. at 1040. It appears that EPA staff immediately informed the House Appropriations Committee staff of the lawsuit and of the likelihood that a restraining order would be entered that day. Agency officials indicated that they had no objection to reducing the rescission by $4 million to cover the claim. On October 18, 1989, a conference committee reported a bill that included the full rescission. The Senate passed the legislation on October 27, and the House gave its assent four days later. *See id.* at 1043 n. 37. The only concession to Rochester's claim is to be found in the conference committee report, which explains that

> [t]he conferees want to emphasize that the inclusion of the bill language rescinding $47,700,000 of section 206(a) funds should not prejudice EPA's consideration of appeals by Rochester, NY and other cities. The conferees urge the Administrator to make a final determination on pending section 206(a) appeals as soon as possible and report the results to the Committees on Appropriations. If the appeals are approved, the conferees expect the Agency to assist the municipalities by identifying in its report to Congress the options available and administrative steps required for payment, including current construction grants appropriations and the claims and judgment fund.

H.R.Rep. No. 101–297, 101st Cong., 1st Sess., 135 Cong.Rec. H7201, 7210 (Oct. 18, 1989) ("Committee Report"). The President signed the appropriations bill into law on November 9, 1989. *See* Pub.L. No. 101–144, 103 Stat. 839 (1989).

After passage of the rescission, the parties agreed to convert Rochester's pending motion for a preliminary injunction into a motion for a permanent injunction. *Rochester*, 724 F.Supp. at 1040 n. 2. Rochester asked the court to exercise its inherent equitable powers "to preserve these funds so that meaningful relief will be available to plaintiffs should they prevail on the merits of their administrative appeals." *Id.* at 1043. "[T]o ensure that plaintiffs will have an adequate remedy should they prevail on their administrative appeals[,]" *id.*, the court granted the permanent injunction "suspend[ing] rescission of these disputed funds (and only these disputed funds) pending final resolution" of Rochester's two administrative appeals. *Id.* at 1047.

After the district court had issued its decision in this case, the agency denied Rochester's administrative appeal, but granted the Deviation Request, allowing Rochester to recover $1,123,682. *See* EPA, Deviation for Rochester Pure Waters (July 27, 1990), *reprinted in* J.A. at Tab 17; EPA, Response to Petition for Review (July 27, 1990), *reprinted in* J.A. at Tab 18. The EPA, however, deferred payment of the $1.12 million under the deviation order until resolution of this action. J.A. at Tab 17. The question of Rochester's entitlement to these funds is not before this court. Rather, we are reviewing actions taken by the district court to ensure that Rochester could collect from the funds that had been appropriated for this purpose in the event it ultimately prevailed in its dispute with the EPA.

Following the agency's twin decisions in July 1990, the district court extended the life of the injunction "until EPA has taken final agency action on each of these two pending matters and the plaintiffs have made timely filings in the appropriate court for judicial review of any adverse final agency action and a ruling has been issued on plaintiffs' contemporaneous request for injunctive relief, if any, from that court." *Rochester Pure Waters Dist. v. EPA*, 1990 WL 134502, 1990 U.S. Dist. Lexis 11357 (D.D.C. Aug. 28, 1990).[1]

---

**1.** Rochester filed additional deviation requests on June 19 and 20, 1990, and a separate administrative appeal on July 10, 1990. Judge Green did not include those actions within the ambit of the permanent injunction. *Rochester Pure Waters Dist. v. EPA*, 1990 WL 134502 at n. 3,

1990 U.S.Dist. Lexis 11357 at n. 3. The record does not reveal whether Rochester has filed for judicial review of the July 27, 1990 agency decisions. Because the EPA has declined to award Rochester the deviation recovery until this court

## II. Discussion

### A. Standard of Review

This appeal presents a question of pure law: whether the district court had the authority to order the permanent injunction. We review this issue *de novo. See Delaware & Hudson Ry. Co. v. United Transp. Union,* 450 F.2d 603, 620 (D.C.Cir.), *cert. denied,* 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971). Under these circumstances, "a reversal based on a disagreement with the underlying legal premise of the trial court is not based on, or to be construed as, a determination of arbitrary abuse of judicial discretion." *Ambach v. Bell,* 686 F.2d 974, 980 (D.C.Cir. 1982) (quoting *NRDC v. Morton,* 458 F.2d 827, 832 (D.C.Cir.1972)).

### B. Analysis

 It is beyond dispute that a federal court cannot order the obligation of funds for which there is no appropriation. *See, e.g., Reeside v. Walker,* 11 How. 272, 291, 13 L.Ed. 693 (1851); *Office of Personnel Management v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 2471–72, 110 L.Ed.2d 387 (1990).[2] Nor can it be contended that a court may appropriate funds from which an obligation may be made. *See* U.S. Const., art. I, § 9, cl. 7; *Cincinnati Soap Co. v. United States,* 301 U.S. 308, 321, 57 S.Ct. 764, 770, 81 L.Ed. 1122 (1937). *See generally* K. Stith, Congress' Power of the Purse, 97 Yale L.J. 1343 (1988) (examining Congress's exclusive power to appropriate). In its decision, the district court ordered the EPA to set aside funds in the face of a rescission by Congress of the underlying appropriation. Because Congress had rescinded the funds, the order, in essence, appropriated funds from the Treasury for possible obligation. We find that the district court lacked such authority.

The court believed that it possessed equitable power to enjoin the rescission, basing its decision on a line of cases in which we awarded injunctions to avoid lapses in an agency's budget authority. This term refers, generally, to the authority granted by Congress to commit or expend funds. *See State of Connecticut v. Schweiker,* 684 F.2d 979, 997 n. 30 (D.C.Cir.1982), *cert. denied,* 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983). In that context, we have held that federal courts have the power "to order that funds be held available beyond their statutory lapse date if equity so requires." *Id.* at 997 (quoting *National Ass'n of Regional Councils v. Costle,* 564 F.2d 583, 588 (D.C.Cir.1977)). *See also Jacksonville Port Authority v. Adams,* 556 F.2d 52, 55–57 (D.C.Cir.1977). *Cf. West Virginia Ass'n of Community Health Centers, Inc. v. Heckler,* 734 F.2d 1570, 1576–77 (D.C.Cir.1984) (district court has power to enjoin lapse of budget authority, but case moot because appropriation exhausted); *City of Los Angeles v. Adams,* 556 F.2d 40, 51 (D.C.Cir.1977) (district court has power to order agency to pay on a claim because it issued order prior to lapse of appropriation at issue). This case presents a very different situation.

In these cases, our exercise of the court's equitable powers has given effect to congressional intent by permitting timely claimants to recover from funds that Congress set aside for that purpose. Budget authority lapse provisions impose deadlines that require agencies to obligate funds within a specified period. That period may be extended in the rare circumstance where the extension will serve the interests of justice and the ends Congress sought to bring about.

In *Jacksonville Port Authority,* the applicant for a grant under the Federal Aviation Administration's ("FAA") Airport and Airways Development Program was denied the grant by the operation of the program's "priority system." A district judge later

reviews the district court's decision, we conclude that this appeal is not moot.

**2.** There may be an exception to this general rule in a case where a court orders expenditures for constitutional reasons. In several cases, the Supreme Court has ordered the broadening of eligibility for federal benefit programs to remedy Equal Protection violations. *See Califano v. Westcott,* 443 U.S. 76, 89–91, 99 S.Ct. 2655, 2663–64, 61 L.Ed.2d 382 (1979) (citing cases). These decisions make no reference to the status of the appropriations for the programs.

struck down that system and ruled that airport sponsors were entitled to their full allotment of airport development funds. *Jacksonville Port Authority,* 556 F.2d at 54. Shortly thereafter, the Port Authority filed suit to obtain the grant and asked for a temporary restraining order as the authorization to obligate funds was scheduled to lapse in a few days. The court declined to issue an order, and the authorization lapsed. *Id.*

We held that the district court abused its discretion by failing to enter the TRO. We noted that Congress employed the lapse mechanism to prevent "procrastination and the dangers of an agency discretion to dip into old unused authorizations." *Id.* at 55. Therefore, the imposition of a deadline "on an agency's ability to take action on its own motion does not preclude an agency's authority to take later action on direction of a court exercising judicial review". *Id.* at 56. As the Port Authority had made timely application within the period the agency was authorized to act, we concluded that we had the authority "in the interest of equity and justice, [to] make the plaintiff whole by ordering the FAA and the district court to act as if there had been a conditional grant prior to [the lapse of the authorization]." *Id.*

Similarly, in *State of Connecticut,* the dispute centered on whether Congress had imposed a deadline for applications by States for reimbursement of certain expenditures under the Social Security Act in recently enacted appropriations legislation. Appellants sought (1) a declaratory judgment that no deadline barred their applications and (2) an injunction "reserving and setting aside a portion of the remaining HHS appropriations for fiscal year 1981" in order to "prevent the remaining fiscal year 1981 funds from reverting to the general Treasury on October 1, 1981." *State of Connecticut,* 684 F.2d at 985–86. The district court dismissed the suit and refused to act on the injunction. During the pendency of the appeal, the appropriation lapsed. We determined that the legislation involved had not imposed a deadline. We therefore remanded to the district court with instructions to enter an injunction to prevent the remaining funds in the program from reverting to the Treasury. *Id.* at 996–99. Because the statutes at issue did not bar the claim, and because we found that the lapse of the appropriations did not reflect a rejection by Congress of the underlying State grants program, we employed equitable authority to suspend the lapse provision. *Id.* at 998–99.

The statutory rescission in the present case is critically different from the lapses of budget authority in *Jacksonville* and *State of Connecticut.* Here, Congress, with full knowledge of Rochester's claim, chose to rescind the appropriated funds that would otherwise have been available to meet that claim. It revoked the exact amount of funds remaining available for section 206(a) grants. The intent of Congress could not be clearer: It did not want any part of the remaining funds to be expended for the section 206(a) grant program, so it canceled the appropriation.

As we have noted, Congress has "absolute control of the moneys of the United States." *Harrington v. Bush,* 553 F.2d 190, 194 n. 7 (D.C.Cir.1977) (citation and internal quotation marks omitted). The Appropriations Clause of the Constitution vests Congress with exclusive power over the federal purse: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., art. I, § 9, cl. 7. The clause "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Cincinnati Soap Co.,* 301 U.S. at 321, 57 S.Ct. at 770. When Congress rescinded the section 206(a) appropriation, the funds reverted to the Treasury. *See* Office of Management and Budget, Circular No. A-34 at II–7 (Aug. 25, 1985) (statutory rescission defined as "[e]nacted legislation canceling budget authority previously provided by Congress, prior to the time when the authority would otherwise lapse."). This is so notwithstanding the district court's temporary restraining order as that order was not, nor could it have been, binding on Congress. Therefore, the order entering a permanent injunction sought to sequester

funds that were no longer subject to a budget authority. It is this fact that distinguishes this case from those on which the district court relied.

Rochester argues, nevertheless, that the rescission legislation could not have an effect on the disputed funds because its claim had matured into an obligation against the United States. Rochester believes that the district court's restraining order converted the claim into a conditional obligation, and that Congress cannot rescind funds that have been obligated. We disagree with Rochester's first contention and therefore do not reach the second. The district court's temporary restraining order did not obligate the United States to pay Rochester, conditionally or otherwise, as the court did not address the merits of Rochester's claim. The TRO simply mandated that the EPA set aside funds to pay a possible judgment. At that point, the funds were at the discretion of the EPA, and the agency could have obligated the funds as it wished.

With limited exceptions, pending litigation does not create an obligation against the United States. *See* 31 U.S.C. § 1501(a) (1988) ("An amount shall be recorded as an obligation of the United States Government only when supported by documentary evidence of ... (6) a liability that may result from pending litigation."); 35 Comp.Gen. 185, 187 (1955) (interpreting precursor of section 1501(a)(6) as applying to land condemnation and similar cases where liability established and only outstanding issue is amount of liability); *In the Matter of the Status of Impounded Food Stamp Program Appropriations Obligated by Court Order,* 54 Comp.Gen. 962, 964–66 (1975) (allowing exception to prior interpretation for impoundment cases). Rochester's situation does not fall within this limited spectrum.

As matters stand, it is unlikely that Rochester will go unpaid if it prevails in its claims against the EPA. The conference committee noted that in such an event, the conferees would expect the agency to pursue alternative sources of payment, *see* Committee Report at H7210; and at oral argument, counsel for the EPA vouched that it would find funds to cover Rochester's claim, even if that required obtaining a supplemental appropriation from Congress.

## III. Conclusion

Because the budgetary lapse cases do not control a situation in which Congress rescinds appropriations with full knowledge of pending claims, the district court's injunction runs afoul of the Appropriations Clause. We therefore reverse and remand the case to the district court.

*So ordered.*