Argued and submitted February 1, remanded for further proceedings December 26, 1985, reconsideration denied February 14, petition for review denied April 1, 1986 (300 Or 704)

# SAMUEL,
*Petitioner,*

*v.*

# BOARD OF CHIROPRACTIC EXAMINERS,
*Respondent.*

## (CA A25531)

712 P2d 132

54

David C. Force, Eugene, argued the cause and filed the briefs for petitioner.

Michael D. Reynolds, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Richardson, Presiding Judge, Joseph, Chief Judge, and Warden, Judge.

RICHARDSON, P. J.

## RICHARDSON, P. J.

Petitioner seeks review of the order of the Board of Chiropractic Examiners (Board) suspending his chiropractic license for four years and permanently revoking his right to perform minor surgery. The Board found that petitioner had performed major surgery, a vasectomy, in violation of the chiropractic licensing statutes. We remand for further proceedings not inconsistent with this opinion.

ORS chapter 684 governs the practice of chiropractic. "Chiropractic" is defined as including "the employment and practice of * * * minor surgery." ORS 684.010(2)(a). Minor surgery is defined in ORS 684.010(4):

" 'Minor surgery' means the use of electrical or other methods for the surgical repair and care incident thereto of superficial lacerations and abrasions, benign superficial lesions, and the removal of foreign bodies located in the superficial structures; and the use of antiseptics and local anesthetics in connection therewith."

ORS 684.015(3) provides that "[n]o person practicing under [ORS chapter 684] shall * * * do major surgery." Major surgery is not defined.

In March, 1981, petitioner performed a vasectomy[1] on one of his patients. The Board learned of the surgery and, in June, 1981, notified petitioner that it intended to revoke his license on the ground that chiropractors are not authorized to perform vasectomies under Oregon law. At the hearing, petitioner did not deny performing the vasectomy, but argued that a vasectomy was "minor surgery" under ORS 684.010(4). The Board disagreed. It found that a vasectomy is not "minor surgery" and that, therefore, it is prohibited "major surgery."

Petitioner sought review by this court and later moved for the appointment of a master under ORS 183.482(7)[2] to conduct a hearing and make findings of fact

---

[1] The terms "vasectomy" and "vasotomy" are used interchangeably in the record. We understand them both to refer generally to the surgical removal of a segment of the *vas deferens* to cause infertility in the male. We will use the term "vasectomy" in this opinion.

[2] As relevant, ORS 183.482(7) provides:

"* * * In the case of disputed allegations of irregularities in procedure before the agency not shown in the record which, if proved, would warrant reversal or

concerning alleged irregularities regarding the hearing. We appointed a master, who held hearings and submitted a report.[3] Before addressing the question of those irregularities, we turn to petitioner's other assignments of error.

■ ■ Petitioner's first assignment raises the issue of whether the Board was required to promulgate rules defining "major surgery" and further defining "minor surgery" before applying those statutory terms. The definition of "minor surgery" is precise. Major surgery is not defined, but we infer that the legislature meant that those procedures that were not included within the definition of "minor surgery" were "major surgery." ORS 684.010(4) provides chiropractors with adequate notice of what procedures are permitted as "minor surgery" and gives the Board a sufficiently precise definition of that term to apply to individual cases. The statutes in question reflect a complete expression of legislative policy. *See Springfield Education Assn. v. School Dist.*, 290 Or 217, 224-25, 621 P2d 547 (1980). Given the definition of "minor surgery," there are no policy decisions for the agency to "flesh out" through rulemaking. The Board's duty is simply to apply the statute to individual cases. It could have promulgated interpretive rules concerning whether a vasectomy was "minor surgery," but it could also, as it did here, decide that issue in a contested case.[4] *Springfield Education Assn. v.*

---

remand, the Court of Appeals may refer the allegations to a Master appointed by the court to take evidence and make findings of fact upon them. The court shall remand the order for further agency action if it finds that either the fairness of the proceedings or the correctness of the action may have been impaired by a material error in procedure or a failure to follow prescribed procedure."

[3] The master's report contains "preliminary findings of fact" and "findings of fact." The former are findings of what occurred in this case; the latter are actually legal conclusions. The legal conclusions are not binding on this court, because, under ORS 183.482(7), the master's duty is limited to taking evidence and making findings of fact. It is our duty to determine whether those findings persuasively show that "either the fairness of the proceeding or the correctness of the action may have been impaired by a material error in procedure or a failure to follow prescribed procedure." ORS 183.482(7).

[4] ORS 684.155(1) provides:

"In addition to any other powers granted by this chapter, the board may:

"(1) Promulgate necessary and proper rules:

"* * * * *

"(b) To enforce the provisions of this chapter and to exercise general supervision over the practice of chiropractic within the state."

*School Dist., supra,* 290 Or at 226; *see also Ross v. Springfield School Dist. No. 19,* 294 Or 357, 368-69, 657 P2d 188 (1982).

Petitioner's reliance on *Megdal v. Board of Dental Examiners,* 288 Or 293, 605 P2d 273 (1980), is misplaced. There, the Supreme Court stated:

"'* * * [W]hen a licensing statute contains both a broad standard of 'unprofessional conduct' *that is not fully defined in the statute itself* and also authority to make rules for the conduct of the regulated occupation, the legislative purpose is to provide for the further specification of the standard by rules, unless a different understanding is shown. * * *'" 288 Or at 313-14. (Emphasis supplied.)

If neither "minor surgery" nor "major surgery" were defined, *Megdal* might support petitioner's argument. However, "minor surgery" is expressly defined and, as we have stated, "major surgery" is implicitly defined. *Megdal* is inapposite. *See Hardt v. Bd. of Naturopathic Examiners,* 44 Or App 679, 684, 606 P2d 1169 (1980).

Petitioner's second assignment is that the Board "unconstitutionally restricted the scope of chiropractic surgery." Essentially, his argument is that the Board erred in deciding that a vasectomy is not "minor surgery." He argues that, when the legislature defined "minor surgery," it intended to expand the scope of chiropractic to include "superficial" surgeries. He argues that a vasectomy is such a procedure and that the Board's decision is contrary to the legislature's intent.

■■ Judicial review of an agency's application of a term representing a complete expression of legislative policy to the facts of a particular case is review for error of law under ORS 183.482(8)(a):

"The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, it shall:

"(A)   Set aside or modify the order; or

"(B)   Remand the case to the agency for further action under a correct interpretation of the provision of law."

Our task is to determine whether the Board's interpretation of the statutes is within the legislative policy of those statutes.

*Springfield Education Assn. v. School Dist., supra,* 290 Or at 225-28. The legislative policy apparent on the face of the chiropractic statutes is that chiropractors should be allowed to perform minor surgery, as defined by the legislature, but should not perform major surgery. The Board's decision that a vasectomy is not within the definition of "minor surgery" is within the legislative policy, because it is a reasonable interpretation of that term.

Petitioner argues that a vasectomy is the "surgical repair and care incident thereto of * * * benign superficial lesions" under ORS 684.010(4). He contends that the term "lesion" refers to any unwanted structure and that a vasectomy involves such a structure (presumably the *vas deferens*). Alternatively, he argues that a "lesion" is any incision made by a surgeon. His first argument is supported only by his own testimony. However, a vasectomy does not involve a lesion as that term is commonly defined. Stedman's Medical Dictionary 774 (23rd ed 1976) defines "lesion" as a "wound or injury." Webster's Third New International Dictionary 1296 (unabridged 1971) defines it as an injury, impairment or flaw. The Board expressly rejected his second argument:

> "Licensee's contention that a 'lesion' may be caused by the surgeon's incision and then become chiropractic minor surgery seems to fly in the face of the statute and common chiropractic understanding. 'Licensee creates the symptom, the disease and the treatment all in one cut.' The Board rejects such a view."

To accept petitioner's argument, once a chiropractor makes an incision, regardless of whether it was justified under the statute, he has created a lesion, which he then may repair under the guise of minor surgery. Surely the legislature did not intend such a result. The Board's interpretation of the statute was not unlawful. *See* ORS 183.482(8)(a).[5]

■  The only issue raised by petitioner's third assignment of error which merits discussion is whether the Board adequately articulated its reasoning in its order. *See Springfield*

___

[5] Petitioner relies on legislative history which may support his argument that the legislature intended to broaden the scope of chiropractic when it enacted the minor surgery statute. Assuming that that was the legislature's intent, that does not answer the question of whether the legislature intended to broaden the scope of chiropractic to include vasectomies.

*Education Assn. v. School Dist., supra; McCann v. OLCC,* 27 Or App 487, 556 P2d 973 (1976), *rev den* 277 Or 99 (1977); *Home Plate, Inc. v. OLCC,* 20 Or App 188, 530 P2d 862 (1975). The Board's first two findings of fact set forth the facts of the case. Its third and fourth findings explain what a vasectomy is and how one is performed. Petitioner does not challenge those findings. The fifth and sixth findings set forth the relevant statutes. The seventh finding provides:

> "A vasectomy surgical procedure is *clearly not* the surgical repair and care incident thereto of (a) superficial lacerations and abrasions, (b) benign superficial lesions, or (c) the removal of foreign bodies located in the superficial structures." (Emphasis in original.)

Although it could have been made more explicit, the Board's reasoning is evident. It found that a vasectomy, as described in its findings, does not involve the procedures described in the statute defining minor surgery. It then concluded that a vasectomy is not minor surgery and that it therefore is major surgery. Later, in the "opinion" portion of its order, the Board rejected petitioner's argument that a "lesion" under the statute includes a surgical incision and set forth its reasoning. The order adequately explains the Board's reasoning.

Petitioner argues that he was denied a fair hearing because of numerous procedural irregularities and moves for a new hearing under ORS 183.482(7). We will address only those alleged irregularities which merit discussion.

Petitioner contends that several members of the Board are personally biased against him. He has the burden of proof on that allegation. *Teledyne Wah Chang v. Energy Fac. Siting Council,* 298 Or 240, 262, 692 P2d 86 (1984); *Boughan v. Board of Engineering Examiners,* 46 Or App 287, 290, 611 P2d 670, *rev den* 289 Or 588 (1980). The five members of the Board who participated in the hearing were Drs. Bolin, Camerer, Strom-Ray and Yaguchi and the public member, Ms. Sorenson. Bolin was the president, and Sorenson was the presiding officer at the hearing.

The record shows that there are two factions of chiropractors in Oregon. Members of the Oregon Association of Chiropractic Physicians (OACP) favor a broad interpretation of what constitutes the practice of chiropractic; members of the United Doctors of Chiropractic (UDC) favor a narrow

interpretation. Members of OACP are colloquially known as "broadscope practitioners." Petitioner is a prominent member and former president of OACP; Board members Bolin and Camerer are founders of the UDC. The record does not disclose whether Strom-Ray or Yaguchi belong to either group. Although there are ideological differences between the two factions, and evidently political friction and hostility, that is not sufficient to show that, by virtue of their membership in the UDC, Bolin and Camerer were disqualified from hearing petitioner's case. It shows that they held beliefs different from those of petitioner concerning the scope of chiropractic and that they may feel some hostility toward OACP members generally, but it does not prove they were personally biased against petitioner.

■ ■     Petitioner argues that, because Bolin had expressed his opinion that a vasectomy was not minor surgery before the hearing, he was prejudiced against petitioner and should have disqualified himself. We disagree. A preconceived point of view concerning an issue of law—such as whether a vasectomy constitutes minor surgery under the chiropractic statutes—is not an independent basis for disqualification. *Trade Comm'n v. Cement Institute,* 333 US 683, 68 S Ct 793, 92 L Ed 1010 (1948); 3 Davis, Administrative Law Treatise 372, § 19.2 (1980).

■     Bolin contacted two chiropractors to ask them whether they would testify at the hearing. He believed that one of them held the opinion that a vasectomy was "illegal" for chiropractors to perform, but he was not certain of that before he called him. There is no evidence of the second doctor's point of view. Petitioner portrays this as an attempt by Bolin to stack witnesses against him and argues that it is further evidence that Bolin was personally biased against him. Again, we are not persuaded. Under ORS 684.150, the Board is authorized to conduct investigations and summon witnesses. Bolin's conduct is entirely consistent with that authority. In the absence of any evidence that the Board members ordinarily did not themselves conduct investigations or summon witnesses, we are not convinced that he was motivated by personal prejudice against petitioner, even though at least one of the doctors he contacted held an opinion contrary to petitioner's interest. Petitioner had the opportunity to and did call witnesses who supported his view.

We conclude that petitioner has not proven that Bolin was so personally biased against him as to deny him a fair hearing.[6]

We do find, however, that Camerer should have disqualified himself. After a Board meeting in June, 1981, Camerer met with four chiropractors of the UDC at a restaurant. He brought the Board's file on petitioner's case and allowed the other chiropractors to examine it. Petitioner later sought censure against Camerer from the Governor and sued him for disclosing the contents of the file. The master found that the lawsuit was filed after the hearing but before the Board's decision. There is persuasive evidence to support that finding, and we adopt it as our own. Camerer testified that, at the time when the Board voted on the matter, he had heard that such a lawsuit had been filed, but he had not been personally served and was not aware that the state had been served with a tort claim notice. As a defendant in the lawsuit, which arose out of the very matter pending before the Board, Camerer may have harbored some animosity towards petitioner. The possibility of personal animosity and the appearance of a substantial basis for bias is sufficient that, under the circumstances, he should have disqualified himself.

Petitioner next alleges that there were off-the-record communications by members of the Board with other persons which should have been disclosed on the record. We find that Camerer, Bolin and Strom-Ray had taken part in off-the-record communications that should have been made part of the record but were not. We briefly summarize the circumstances surrounding those communications.

The first occurred when Camerer showed the Board's file on petitioner's case to the four members of the UDC in June, 1981. Exactly what was said concerning petitioner's case is not clear, but it was discussed.

Bolin on at least two occasions discussed the legal issue in petitioner's case with non-Board members. In February or April, 1982, he met Dr. Hebert at a restaurant. Hebert

---

[6] Respondent contends that whether or not Bolin was biased against petitioner is irrelevant, because he abstained from voting in this matter. We disagree. He participated in the hearing and, although he did not vote, it is possible that his discussions with the other Board members influenced their vote.

had been appointed to the Board but had not yet been seated. Bolin briefed him concerning the matters pending before the Board, and they discussed the minor surgery statute at length. Bolin tried to explain to Hebert why he concluded that a vasectomy was not minor surgery under the statute. Bolin had a similar discussion with Dr. Crothers, a physician who was the medical director of the Workers' Compensation Department, in which they discussed whether a vasectomy was major or minor surgery. There is evidence that this discussion related directly to petitioner's case.

Finally, before Strom-Ray formally joined the Board in May, 1981, she received a packet of materials from the Board concerning matters then pending before it, including petitioner's case. After receiving it, she contacted two broad-scope practitioners concerning whether vasectomies were taught at chiropractic colleges and whether they were commonly performed by chiropractors without the Board's knowledge.

Petitioner's right to a fair hearing was compromised by the Board's failure to place these communications on the record.

"If there is one principle that is fundamental in administrative law, it is that of *exclusiveness of the record.* In any proceeding that is judicial in nature, whether in a court or an agency, the process of decision must be governed by that principle. The exclusiveness principle and its foundation were well stated by Chief Justice Vanderbilt: ' "Where a hearing is prescribed by statute, nothing must be taken into account by the administrative tribunal in arriving at its determination that has not been introduced in some manner into the record of the hearing." . . . Unless the principle is observed, the right to a hearing itself becomes meaningless. Of what real worth is the right to present evidence and to argue its significance at a formal hearing, if the one who decides the case may stray at will from the record in reaching his decision? Or consult another's findings of fact, or conclusions of law, or recommendations, . . .?'

"The more one deals with agency proceedings, the more he realizes that exclusiveness of the record is at the core of the right to a fair hearing. Without that principle the hearing itself can be but a sham. The agency may go through the motions and receive mountains of evidence, testimonial and documentary; yet the elephantine record is but a facade if the

agency may rely upon material not represented at the hearing. Secret evidence or even a secret conference of a few minutes can destroy a lengthy trial. Only if the agency is limited to the record of the hearing can the private party have assurance that he not only has a full opportunity to present his case but, more important, opportunity to confront and rebut the entire case against him. Without the exclusiveness principle the right to be heard is a right only to present one side of the case. The hearing itself becomes only an administrative town meeting rather than the adversary proceeding required by due process." Schwartz, Administrative Law 357-58, § 125 (1976). (Footnotes omitted.)

*See also Rolfe v. Psychiatric Security Review Board,* 53 Or App 941, 633 P2d 846, *rev den* 292 Or 334 (1981). The exclusiveness of the record principle is reflected in the Oregon Administrative Procedures Act. ORS 183.415(8), (9); ORS 183.450(2), (5); ORS 183.462.

Although it is doubtful, given the nature of the basic issue at the hearing, that Bolin and Camerer received relevant factual information, the appearance of impropriety compromises the fairness of the hearing. Petitioner admitted performing the vasectomy, and so there was little factual dispute. However, the Board decided not only the statutory meaning of minor surgery but also imposed sanctions. The extra record discussions and information received by the Board members may have had an impact on both decisions.

Whether a vasectomy is "minor surgery" under ORS 684.010(4) is an issue of law, ultimately to be determined by the court. *Springfield Education Assn. v. School Dist., supra,* 290 Or at 224. We have upheld the Board's interpretation of the statute. A remand for reconsideration of that issue would serve no purpose regardless of the procedural irregularities that occurred. However, because the extra record discussions and the presence of Camerer may have influenced the Board's choice of a sanction, we remand for reconsideration of the appropriate sanction.

Remanded for further proceedings not inconsistent with this opinion.