# IN THE SUPREME COURT OF IOWA

No. 13–0505

Filed April 18, 2014

**IN THE MATTER OF THE GUARDIANSHIP AND CONSERVATORSHIP OF STUART KENNEDY (INVOLUNTARY)**

**STUART KENNEDY,**

Appellant,

vs.

**MARIA KENNEDY,**

Appellee.

---

Appeal from the Iowa District Court for Polk County, Peter A. Keller, Judge.

A ward appeals from probate court orders refusing to terminate his guardianship and establishing a conservatorship. **AFFIRMED.**

William L. Bushell of Bushell Law Firm, Des Moines, for appellant.

John H. Judisch of Stuyvesant & Benton, Carlisle, for appellee.

Rita Bettis and Randall C. Wilson, Des Moines, for amicus curiae ACLU of Iowa, and Cynthia A. Miller, Des Moines, for amicus curiae Disability Rights Iowa.

**MANSFIELD, Justice**.

This case presents the question whether a mother who serves as her intellectually disabled adult son's guardian must obtain court approval before arranging a vasectomy for him. We conclude the relevant statute requires court approval. However, we do not disturb the orders entered by the probate court that declined to terminate the mother's guardianship and also appointed her conservator.

### I. Factual and Procedural Background.

Stuart Kennedy is a twenty-one-year-old man with significant intellectual disabilities who lives in a group home. The home is staffed around the clock. The staff help Stuart with various daily tasks, such as time management, finances, and transportation. Stuart has made progress at the group home and, for example, is able to prepare simple meals for himself. Stuart receives SSI benefits as well as $700 to $800 a month from a job at Sam's Club.

In late 2009, after Stuart turned eighteen, his mother Maria Kennedy was appointed as his guardian. The guardianship continued. In late 2012 or early 2013, Maria became concerned that Stuart was involved in a relationship with Annamarie Jalali, a coworker at Sam's Club. Stuart admits he told his mother that he and Jalali were having sex, although at the subsequent court hearing, both Stuart and Jalali denied they were anything more than friends. Stuart also provided money to Jalali to cover certain of her expenses. In addition, Jalali took Stuart to a credit union to open a bank account.

In January 2013, Stuart filed a handwritten petition to terminate the guardianship, alleging among other things that his mother was "too control[l]ing of my life and my money." Maria in turn filed a petition for appointment of an involuntary conservator for Stuart and a petition for

an injunction against Jalali, seeking a court order that she not have further contact with Stuart.

Before these matters could be heard, on February 18, 2013, Maria took Stuart to a doctor's office to get a vasectomy. Maria contends that Stuart was in favor of the procedure and that it had been discussed and agreed to. Stuart, however, disputed that he had wanted the vasectomy. On February 21, 2013, Stuart's attorney filed a further petition to terminate or modify the guardianship reciting that "the Guardian forced the Ward to undergo forced sterilization."

A combined hearing on the petitions was held on February 27, 2013. Maria, Stuart, and Jalali all appeared through counsel and each of them testified. The court also received letters from Stuart's regular physician (not the individual who performed the vasectomy) and from Stuart's case manager. One subject of the hearing was whether Maria had violated Iowa Code section 633.635(2)(*b*) by arranging for Stuart's vasectomy without court approval. Iowa Code § 633.635(2)(*b*) (2013). Evidence was also presented at the hearing that when law enforcement recently went to Jalali's home to look for Stuart, Jalali had refused to answer her door or inform them of Stuart's whereabouts. Additionally, Jalali and Stuart had discussed Stuart renting out her basement in exchange for Stuart paying half the rent.

At the conclusion of the hearing, the probate court declined to terminate Stuart's guardianship. It reasoned that Stuart continued to be in need of a guardian and that Maria was a qualified and suitable person to continue to serve as his guardian. The court further found that Maria had not violated section 633.635(2)(*b*) because the vasectomy was not "major elective surgery." Even if Maria had violated section 633.635(2)(*b*), the court added,

> [Maria] did not make such arrangement or provide assistance out of malice or some other evil intent or purpose, but did so as a result of her desire to care for her son and do what is in his best interest and as such, this Court would still find that Stuart remains in need of a Guardian and Maria Kennedy should not be removed as Guardian for Stuart Kennedy.

The court also ordered Maria's appointment as Stuart's conservator. Finally, the court entered an injunction against Jalali having contact with Stuart until March 2014, finding she had

> taken advantage of Stuart Kennedy as a result of his significant intellectual disabilities and inability to make, communicate, or carry out important decisions concerning his own financial affairs and has done so to her pecuniary gain and to the financial detriment of Stuart.

Stuart appealed the orders appointing his mother as conservator and refusing to terminate the guardianship. He did not appeal the injunction against Jalali. Throughout this appeal, Stuart has maintained the probate court erred in finding the vasectomy was not major elective surgery or a nonemergency major medical procedure requiring prior court approval. However, at oral argument Stuart's attorney indicated that Stuart was no longer seeking to alter the guardianship or the conservatorship. At this point, he simply wants a ruling that prior court approval should be required for the sterilization of a male ward.

## II. Standard of Review.

Actions to terminate guardianships are equitable in nature, and thus our review is de novo. Iowa Code § 633.33; *In re Guardianship of B.J.P.*, 613 N.W.2d 670, 672 (Iowa 2000). We give weight to the factual findings of the probate court, but we are not bound by them. *In re Guardianship of Stewart*, 369 N.W.2d 820, 822 (Iowa 1985). Actions to appoint conservators, however, are tried at law. Iowa Code § 633.33.

Therefore, the review is for errors at law. *In re Conservatorship of Deremiah*, 477 N.W.2d 691, 692 (Iowa Ct. App. 1991).

### III. Legal Analysis.

**A. Motion to Dismiss Appeal.** As a threshold matter, we must address Maria's motion to dismiss Stuart's appeal. Maria points out that the probate court appointed Stuart's counsel "to represent the interests of the proposed ward throughout the conservatorship proceedings and until such time as an Order Appointing Conservator is filed." Thus, she contends Stuart's counsel no longer has authority to represent him, such authority having terminated on March 4, when the court entered the order appointing her as conservator. She then maintains we should dismiss the appeal because the attorney of record lacks authority to pursue it.

We decline to dismiss the appeal. Maria does not dispute that Stuart is entitled to representation in the conservatorship proceeding, including any appeal from the order appointing her as conservator. *See* Iowa Code § 633.575(1)(*a*).[1] She does not argue that Stuart should be represented on appeal by somebody else. She also does not dispute that Stuart's counsel filed and served a timely notice of appeal, is actually pursuing the appeal, and has otherwise complied with our procedural requirements. Her only argument is that Stuart's counsel should have obtained an order from the probate court renewing counsel's appointment for purposes of appeal.

---

[1]Although Stuart's counsel was not specifically appointed to represent him in the termination of guardianship proceeding, the proceedings were heard together, and the court and the parties have treated the appointment as extending to the termination of guardianship proceeding.

We think this argument confuses two things—counsel's ability to represent Stuart and his ability to get paid for doing so. The expiration of the appointment order could affect compensation, since the attorney would no longer be "court appointed." *See id.* § 633.575(6) (stating that "if the ward is indigent the cost of the *court appointed* attorney shall be assessed against the county in which the proceedings are pending" (emphasis added)).[2] Yet, in our view, it does not impair the attorney's ability to keep representing Stuart if Stuart wants the attorney to stay on and no other counsel has been appointed. *See* Iowa Ct. Rule 6.109(4) ("The attorneys and guardians ad litem of record in the district court shall be deemed the attorneys and guardians ad litem in the appellate court unless others are retained or appointed and notice is given to the parties and the clerk of the supreme court.").

Further, even if we found a violation, this is not a situation where we would lack jurisdiction or authority over the case. Thus, we would typically grant dismissal "only if the alleged infractions are repeated or significant and have resulted in prejudice to another party or the administration of justice." Iowa Ct. R. 6.1006(1)(*a*); *see Hanson v. Harveys Casino Hotel*, 652 N.W.2d 841, 843 (Iowa Ct. App. 2002) (dismissing an appeal because of substantial violations of the appellate rules). We do not find such circumstances here. Accordingly, we deny the mother's motion to dismiss the appeal based on the alleged lack of authority of Stuart's attorney to pursue it.

**B. Mootness.** The next question we must entertain is whether this appeal is moot. The vasectomy has already occurred, and Stuart no

---

[2]This assumes that the original order does not cover appellate proceedings, a point we do not decide.

longer asks that Maria be removed as a guardian (or that the conservatorship be overturned) because she arranged for an unauthorized vasectomy. He does, however, continue to challenge the legality of the vasectomy.

> An appeal is moot if it no longer presents a justiciable controversy because [the contested issue] has become academic or nonexistent. The test is whether the court's opinion would be of force or effect in the underlying controversy. As a general rule, we will dismiss an appeal when judgment, if rendered, will have no practical legal effect upon the existing controversy.

*In re M.T.*, 625 N.W.2d 702, 704 (Iowa 2001) (citations and internal quotation marks omitted). "We do not decide cases when there is no longer any actual controversy, unless we exercise our discretion and decide the case under an exception to the mootness doctrine." *In re S.P.*, 719 N.W.2d 535, 537 (Iowa 2006).

An exception to the general rule exists " 'where matters of public importance are presented and the problem is likely to recur.' " *In re M.T.*, 625 N.W.2d at 704 (quoting *Iowa Freedom of Info. Council v. Wifvat*, 328 N.W.2d 920, 922 (Iowa 1983)); *see also In re B.B.*, 826 N.W.2d 425, 428–29 (Iowa 2013); *Reilly v. Iowa Dist. Ct.*, 783 N.W.2d 490, 493 n.1 (Iowa 2010); *In re S.P.*, 719 N.W.2d at 537. An important factor thereunder is "whether the challenged action is such that often the matter will be moot before it can reach an appellate court." *In re M.T.*, 625 N.W.2d at 704–05 (citations and internal quotation marks omitted). We have applied a four-part test that considers the following:

> (1) the private or public nature of the issue; (2) the desirability of an authoritative adjudication to guide public officials in their future conduct; (3) the likelihood of the recurrence of the issue; and (4) the likelihood the issue will recur yet evade appellate review.

*State v. Hernandez-Lopez*, 639 N.W.2d 226, 234 (Iowa 2002); *accord State v. Kramer*, 760 N.W.2d 190, 195 (Iowa 2009); *In re A.W.*, 741 N.W.2d 793, 804 (Iowa 2007); *In re S.P.*, 719 N.W.2d at 537; *In re T.S.*, 705 N.W.2d 498, 502 (Iowa 2005).

Both parties urge that we retain the appeal to decide whether a guardian must obtain advance court approval before arranging for the sterilization of a male ward. They contend this issue is of public importance and likely to recur. We agree with them.

As we discuss below, sterilization of a ward is an important subject with constitutional overtones. True, it is possible for the question whether sterilization may occur without prior court approval to come before an appellate court in a nonmoot case. However, either of the two potential scenarios in which this might occur would be less than ideal. In one scenario there would be prolonged uncertainty whether or not a medical procedure will occur while an appeal winds its way through our courts. In the other scenario (as was originally the case here) a ward would be seeking to impose some collateral consequence on the guardian after the procedure had already occurred. We therefore find the public importance exception applies and turn to the meaning of Iowa Code section 633.635(2).

**C. Construction of Iowa Code Section 633.635(2).** Stuart argues on appeal that court approval should have been required for his vasectomy. Stuart urges, contrary to the probate court's ruling, that it is a "major elective surgery" or a "nonemergency medical procedure." The relevant statute provides as follows:

> 2. A guardian may be granted the following powers which may only be exercised upon court approval:
>
> . . . .

*b.* Arranging the provision of major elective surgery or any other nonemergency major medical procedure. For the purposes of this paragraph, "*major elective surgery*" and "*nonemergency major medical procedure*" do not include the provision to the ward of professional care, counseling, treatment, or services limited to the provision of routine physical and dental examinations and procedures under anesthesia, if the use of anesthesia is necessitated by the physical or mental disability of the ward, and if the anesthesia is provided within the scope of the health care practitioner's scope of practice.

. . . .

3. For the purposes of this section:

*a.* "*Routine dental examinations and procedures*" includes preventive services, diagnostic services, restorative services, periodontal services, endodontic services, oral surgery, prosthetic services, and orthodontic procedures.

*b.* "*Routine physical examinations and procedures*" includes examinations and procedures performed for the purpose of general treatment or diagnosis or for the purpose of treatment or diagnosis related to a specific illness, symptom, complaint, or injury.

Iowa Code § 633.635(2)–(3).

The legislature's delineation of the guardian's role in a ward's care, including medical treatment, has evolved and become more detailed over the past thirty years. Prior to 1984, no language about medical procedures was contained in the Code. *See* Iowa Code § 633.635 (1983). The law simply said that "[u]nless otherwise directed by a court order," a guardian "shall have custody of a minor ward and general supervisory responsibility for the care of a ward who has attained the age of majority." *Id.*

In 1984, the legislature removed that language and added two sections, one outlining powers and duties a guardian could exercise *without* prior court approval—including ensuring the receipt of emergency medical services, "professional care, counseling, treatment, and services as needed"—and another outlining those which could be

exercised only *with* court approval—"major elective surgery" and "other nonemergency major medical procedures." These became subsections (1) and (2) of section 633.635. *See* 1984 Iowa Acts ch. 1299, § 16 (codified at Iowa Code § 633.635 (1985)).

An additional amendment in 2000 gave us the provisions excluding routine dental and physical examinations and procedures from the scope of "major" elective surgery or "major" nonemergency medical procedures, and the provisions discussing anesthesia. *See* 2000 Iowa Acts ch. 1063, §§ 2–3 (codified at Iowa Code § 633.635(2)–(3) (2001)).

We have not previously construed the terms "major elective surgery" and "nonemergency major medical procedure" as used in section 633.635(2). However, we have indirectly touched on the present dispute. In *In re Guardianship of Matejski*, the legal guardians of an intellectually disabled daughter filed a court application under section 633.635 to have her sterilized. 419 N.W.2d 576, 576, 578 (Iowa 1988). We held that the district court had subject matter jurisdiction to hear the application. *Id.* at 579–80. We rejected the notion, embraced by some other states' courts, that courts lack jurisdiction over this issue. *Id.* As we put it,

> Stated another way, we do not believe our courts lack jurisdiction over a case merely because the case is important or unavoidably includes a constitutional dimension. Appellee, in effect, would have us remove the present issue from the decisional process provided by our law and judicial system. We know of no area of law where this has been done.

*Id.* at 579.

We added,

> We also disagree with appellee's contention that the 1977 legislative repeal of the theretofore-existing mandatory sterilization law, *see* Iowa Code ch. 145 (1977), coupled with

the legislature's failure to enact new provisions concerning the topic, manifest a legislative intent that the district court not be vested with the power to authorize sterilizations.

*Id.* at 580. Lastly, we declined to "outline a series of procedural protections and substantive criteria to guide the lower courts in adjudicating these applications," explaining that we were "not persuaded that such action is appropriate given the posture of the present case." *Id.*

While *Matejski* doesn't say the district court has to authorize a sterilization, it would be fair to say we considered the decision to authorize it "important" and we anticipated the district courts would be "adjudicating these applications." *Id.* at 579–80. Also, while *Matejski* of course involved a tubal ligation rather than a vasectomy, the opinion used only the term "sterilization" and did not distinguish female or male sterilizations. *Id.* It thus arguably offers some support to Stuart's position that court approval is required for a vasectomy.[3]

In holding that a vasectomy is not a "major elective surgery," the probate court here focused on two points: (1) it "is approximately a 20 minute procedure which is performed in a doctor's office as opposed to a surgical center or operating room and it does not require the use of anesthesia," and (2) it "is reversible, albeit by a more intrusive procedure which could be deemed to be major elective surgery." The first finding is supported by testimony in the record, but the second is not. Amici curiae ACLU of Iowa and Disability Rights Iowa contend that a significant percentage of the time, a vasectomy is *not* reversible. We should not be

---

[3]Note that *Majetski* was decided after the 1984 amendment but before the 2000 amendment.

trying to resolve a medical debate. Our decision therefore does not turn on the rate at which a vasectomy can be reversed.

As the foregoing quotation from section 633.635 indicates, the statute does not define "major elective surgery" or "nonemergency major medical procedure" except to make it clear that the terms do not include

> professional care, counseling, treatment, or services limited to the provision of routine physical and dental examinations and procedures under anesthesia, if the use of anesthesia is necessitated by the physical or mental disability of the ward, and if the anesthesia is provided within the scope of the health care practitioner's scope of practice.

Iowa Code § 633.635(2)(*b*). The statute goes on to explain that "[r]outine physical examinations and procedures" include "examinations and procedures performed for the purpose of general treatment or diagnosis or for the purpose of treatment or diagnosis related to a specific illness, symptom, complaint, or injury." *Id.* § 633.635(3)(*b*) (emphasis omitted). Thus, the term "routine" appears to modify both "examinations" and "procedures."

We are not persuaded that a vasectomy is a routine procedure within the meaning of section 633.635(3)(*b*). It is not designed to treat a specific illness, symptom, complaint, or injury. *See Fuller v. CBT Corp.*, 905 F.2d 1055, 1057 (7th Cir. 1990) (indicating that a vasectomy produces a "condition"). If a vasectomy is not routine, it follows that it could be "major."

Hence, after considering the statute as a whole, we believe the terms "major elective surgery" and "nonemergency major medical procedure" are ambiguous as applied to a vasectomy. *See Samuel v. Bd. of Chiropractic Exam'rs*, 712 P.2d 132, 135 (Or. Ct. App. 1985) (holding that a vasectomy is "major surgery" under Oregon law that cannot be performed by chiropractors). If the focus is on the medical risk and

inconvenience associated with the vasectomy procedure, it may not be considered "major." On the other hand, the immediate consequence of the procedure, i.e., loss of the ability to procreate, is certainly important. "Major" is not a word that cries out with precision.

We have interpreted ambiguous statutes in the past to avoid constitutional problems. *See State v. Iowa Dist. Ct.*, 843 N.W.2d 76, 85 (Iowa 2014) (discussing the doctrine of constitutional avoidance and observing that "the proper course in the construction of a statute may be to steer clear of 'constitutional shoals' when possible"). "If fairly possible, a statute will be construed to avoid doubt as to constitutionality." *Simmons v. State Pub. Defender,* 791 N.W.2d 69, 74 (Iowa 2010); *see also* Iowa Code 4.4(1) (setting forth the presumption that in enacting a statute, "[c]ompliance with the Constitutions of the state and of the United States is intended"); *L.F. Noll Inc. v. Eviglo*, 816 N.W.2d 391, 398 (Iowa 2012); *In re Prop. Seizure for Forfeiture from Young,* 780 N.W.2d 726, 729 (Iowa 2010) (noting "our mandate to construe statutes in a fashion to avoid a constitutional infirmity where possible" but adding that this principle does not apply when "[t]he language is not ambiguous").

A statutory scheme that empowered a court-appointed actor (i.e., a guardian) to have an intellectually disabled person sterilized without some form of judicial review would raise serious due process concerns, in our view. Some time ago, in *Skinner v. Oklahoma,* the United States Supreme Court reversed a judgment directing that a vasectomy be performed on an Oklahoma man who was deemed a "habitual criminal." 316 U.S. 535, 537–38, 62 S. Ct. 1110, 1111–12, 86 L. Ed. 1655, 1658 (1942). The Court emphasized that the right to procreate is "fundamental" and found that the law did not meet the requirements of

the Equal Protection Clause. *Id.* at 541, 62 S. Ct. at 1113, 86 L. Ed. at 1660.

The rationale of *Skinner* has been followed in cases involving the sterilization of a ward. In *In re Estate of K.E.J.*, the court—recognizing the constitutional rights of the ward—set forth a detailed protocol that had to be followed before a court could approve sterilization of either a male or a female mentally disabled adult ward. 887 N.E.2d 704, 720–21 (Ill. App. Ct. 2008); *see also In re C.D.M.*, 627 P.2d 607, 612 (Alaska 1981) (noting sterilization results in the permanent termination of "the intensely personal right to procreate," and therefore requires the court to "jealously guard" the rights of the ward by requiring full judicial hearing where the advocates of the operation "bear the heavy burden of proving by clear and convincing evidence that sterilization is in the best interests" of the individual); *In re Terwilliger*, 450 A.2d 1376, 1382–84 & n.1 (Pa. Super. 1982) (noting the existence of a fundamental right under *Skinner* and requiring court approval for sterilization of either a male or a female adult ward); *In re Guardianship of Hayes*, 608 P.2d 635, 639, 641 (Wash. 1980) (noting "[s]terilization touches upon the individual's right of privacy and the fundamental right to procreate" and establishing requirements that must be met before a court can order the sterilization of an intellectually disabled person, including representation by a guardian ad litem and medical, social, and psychological evaluations of the individual); Eric M. Jaegers, *Modern Judicial Treatment of Procreative Rights of Developmentally Disabled Persons: Equal Rights to Procreation and Sterilization*, 31 U. Louisville J. Fam. L. 947, 979 (1992) (discussing the evolution of sterilization laws in America and noting sterilization is "the permanent physical deprivation of a fundamental constitutional right" and "[m]odern American courts have given substantial judicial

respect to the rights of developmentally disabled persons, allowing sterilization only when necessary, or not at all").

In light of the foregoing, as noted, we would have serious doubts about the constitutionality of a statute that allowed a guardian to arrange for a ward to undergo a vasectomy without *any* court involvement. Accordingly, applying the principle of constitutional avoidance, we hold that a vasectomy is a "major elective surgery" and a "nonemergency major medical procedure" for which prior court approval is required.

For the reasons previously stated, we decline to disturb the probate court's orders regarding Maria's guardianship and conservatorship of Stuart. Nonetheless, we hold that section 633.635(2) required Maria to get prior court approval for Stuart's vasectomy.

**IV. Conclusion.**

We affirm the guardianship and conservatorship orders entered by the probate court.

**AFFIRMED.**