ALBIA LIGHT & RAILWAY COMPANY, Appellee, v. GOLD GOOSE COAL & MINING COMPANY et al., Appellants.

**SPECIFIC PERFORMANCE:** Proof of Contract. Specific performance of a contract will not be ordered in the absence of clear and satisfactory proof of the contract.

*Appeal from Monroe District Court.*—D. M. ANDERSON and FRANCIS M. HUNTER, Judges.

MARCH 10, 1920.

OPINION ON REHEARING DECEMBER 15, 1921.

ACTION in equity, for the specific performance of an oral contract by the alleged terms of which appellant agreed to furnish all of the coal appellee would require from May, 1916, to April 1, 1917, at an agreed price per ton for steam and mine-run coal. Appellant, in December, refused to supply appellee with coal at the price which it is claimed was fixed by the oral contract. Plaintiff, appellee herein, thereupon commenced this action in equity for the specific performance of the contract, and obtained a temporary restraining order enjoining appellant from

refusing to furnish coal and commanding it to supply appellee therewith until the further order of the court, upon the payment by appellee of the alleged agreed price. Upon final hearing, which was after April 1, 1917, the temporary injunction was made permanent, and a decree for specific performance of the contract entered, as prayed. Defendants appeal.—*Reversed.*

*Richmond & Richmond* and *N. E. Kendall,* for appellants.

*J. C. Mabry* and *D. W. Bales,* for appellee.

PER CURIAM.—This is an action in equity, to compel the specific performance of an oral contract, the particulars of which we will state later. Upon a former submission of the case, an opinion was filed reversing the judgment and decree of the court below (*Albia L. & R. Co. v. Gold Goose Coal & Min. Co.,* 176 N. W. 722), and a rehearing granted. The case comes to us at this time on resubmission.

Plaintiff, the Albia Light & Railway Company, appellee herein, is a corporation organized under the laws of the state of Delaware, owning and operating an electric light, power, gas plant, and heating system, together with 10 miles of city and interurban railway at Albia and in Monroe County.

It is alleged in plaintiff's petition that it supplies electric light and gas for the citizens of Albia, and also heat for all business houses, and street car service between depots and other parts of the city, and that it operates two short interurban lines.

Defendant the Gold Goose Coal & Mining Company is a corporation organized under the laws of the state of Iowa, and is engaged in the business of mining and selling coal, near the city of Albia. The present owners of the mining company, G. A. Morrow, M. C. Falvey, William T. and L. T. Richmond, all of whom reside at Albia, in May, 1916, purchased the mining property which was formerly owned and operated by the Croation Coal Company, and from which appellee formerly purchased its coal.

There is a tipple at the mine, and a chute so placed that appellee was able to load its car with coal from a switch owned by it. The loading was done by the employees of appellee. Appel-

lee alleged in its original petition that, on or about October 10, 1916, an. oral contract was entered into by Mr. Boyer, general manager and superintendent of appellee, on its behalf, and by Mr. Morrow, general manager of appellant, upon its behalf, by the terms of which the latter agreed to supply all the coal appellee would require for the operation of its light, power, gas, heating, and railway plants, at $1.25 per ton for steam and $1.60 per ton for mine-run coal from that date until April 1, 1917.

In an amendment to its original petition, appellee alleged that the oral contract was originally entered into between the parties on May 25th or 26th, and that the price then agreed upon was $1.25 for steam coal and $1.60 per ton for mine-run coal. As to the following matters, the evidence is without dispute: to wit, that, on or about May 25th or 26th, Boyer and Morrow had a conversation, and orally agreed that appellant would supply steam and mine-run coal to appellee at the mine near Albia at $1.25 and $1.60 per ton respectively; that appellant would render statements on the 1st and 15th of each month; that coal was received by appellee and paid for at the price and upon the terms agreed upon until about the 10th of October, when Boyer complained to Mr. Morrow that the price fixed was too high, and asked for a reduction thereof; that, after some negotiations, Mr. Morrow agreed that appellant would furnish the steam coal at $1.20 per ton, the price of the other coal to remain at $1.60. This arrangement was carried out by the parties until the 29th of November. There is evidence of other matters that is not in serious dispute, but this evidence will be considered generally only.

Mr. Boyer testified that, by the terms of the May contract, Morrow agreed that appellant would furnish coal to appellee at the price then agreed upon until April 1, 1917; that the same date for expiration of the contract was agreed upon in October, when the price of steam coal, at Boyer's request, was reduced from $1.25 to $1.20 per ton. The direct testimony of Mr. Boyer is to some extent corroborated by the testimony of J. E. Smith, chief engineer of appellee at its power plant. This witness was in the vicinity, and heard a part of the conversation between Boyer and Morrow in May, and also in October. He testified that he heard

Morrow say that appellant would furnish coal at the price above stated until April 1, 1917, and that he heard him say in October that he would furnish the steam coal at $1.20 per ton, but that the price of the mine-run coal would have to remain at $1.60. He does not claim to have heard what, if anything, was said as to the period covered by the October agreement. One other witness corroborated Mr. Boyer's testimony that the price originally fixed was $1.25 for steam and $1.60 for the other coal, but his testimony does not go to the disputed point in the case. As against the testimony of these witnesses is the direct testimony of Mr. Morrow, which is corroborated in some particulars by the direct testimony of other witnesses. According to Mr. Morrow's version of the contract, he told Mr. Boyer in May that appellant would furnish coal to appellee for the time being, or temporarily, at the price already stated, but that the price was too cheap, and that he was not certain as to the possible output of the mine. Concerning the transaction on October 10th, the testimony of this witness varies from the testimony of Boyer only as to the length of time during which coal was to be furnished at the price stated. He denied emphatically that he agreed, either in May or October, to furnish appellee with coal at the price mentioned until April 1, 1917, or for any designated period, and asserted that he specifically stated that appellant would not agree to supply coal for any definite period at the price fixed.

We come now to consider some collateral facts and circumstances tending to corroborate or to contradict the claim of one party or the other. The coal was dumped through a chute at the mine into a steel coal car belonging to appellee, which was transported by its own power to its plant over its interurban railway. The coal was not weighed, either at the mine or at appellee's power plant. The estimated capacity of the car was 12 tons, and statements were, for a time, rendered by appellant upon that basis. In July, 1916, a controversy arose between the parties, Mr. Morrow and his associates insisting that the car was overloaded by appellee's employees, and bills were sent upon the basis of 13 tons for some loads and as high as 15 tons for some. At a conference between the parties in July, 1916, at which Morrow, Falvey, Richmond, and Boyer were present, an

adjustment of the controversy was agreed upon, and thereafter, so far as the evidence shows, observed by the parties. Falvey, a stockholder and director of the coal company, testified that he stated to Mr. Morrow, on that occasion, that:

"I finally told Mr. Boyer—told him as emphatically as I possibly could—that we wanted him to have 2,000 pounds of coal for a ton, neither more nor less; that, when the price that he was paying us was not sufficient, that we would let him know, and he could either meet our price or get his coal some place else; and that, when he thought we were charging him too much, he could let us know, and we would meet his price, or he could get his coal some place else. Q. Is that what you told Mr. Boyer? A. That is what I told him. I told him I wanted a thorough and full understanding. Q. What did Mr. Boyer say to that? A. Mr. Boyer said that was all right; that was satisfactory."

Both Richmond and Morrow corroborate Falvey on this point, and Boyer testified in rebuttal that he did not remember hearing Falvey make the above statement. Boyer, as already stated, testified that he complained to Morrow in October that the price charged for the coal was too high, and obtained a concession of five cents per ton on steam coal. Mr. Morrow testified that Boyer, at different times, threatened to buy coal of a syndicate, or to make arrangement to get it from Centerville, complaining that the price was too high. This was denied by Boyer. Some testimony was introduced by appellee, tending to show that the price of $1.20 for steam and $1.60 for mine-run coal was somewhat excessive, during a portion of the time covered by the admitted agreement.

Some time during November, Boyer was notified by Morrow that appellant intended to raise the price of coal. Boyer, Morrow, and L. T. Richmond met in November at the office of the latter, who is a lawyer practicing his profession at Albia, to discuss the price at which coal was to be supplied in the future by appellant. There is some conflict in the testimony of Boyer and the other witnesses as to what was said on this occasion; but in the main, their testimony fully coincided. According to Boyer, Richmond opened the negotiations with the statement that appellee had no contract with appellant, and that the price

of coal would have to be raised, commencing November 15th, to $1.50 for steam coal and $2.00 per ton for mine-run coal. The witnesses agree that Boyer asked for a few days to confer with the officers of his company as to the proposed increase in price, which was granted by the opposite parties. A few days later, Boyer had his attorney prepare a written contract, which was dated December 1, 1916, providing that appellant agreed to furnish coal to appellee at $1.45 and $1.85 per ton until April 1, 1917. In the meantime, Morrow conferred with his associates, and was informed by them that appellant could not supply the coal to appellee at $1.50 and $2.00 per ton, and it was proposed to supply it at $2.50 per ton for both steam and mine-run coal. Boyer declined this proposition. Some time in the latter part of December, Richmond notified Boyer that all coal received by appellee thereafter would be at the rate of $3.00 per ton, and that a check for $36 must accompany each demand for a carload of coal. This resulted in the commencement of this action. At none of the various conferences between Boyer and the representatives of appellant did he make more than a casual claim that there was an oral contract, or that appellant had agreed to supply appellee with coal for a definite period at $1.25 and $1.60 per ton respectively for steam and mine run coal. At some of these conferences he said nothing about the contract. It must be conceded that his course of dealing was scarcely consistent with that of one who had a right to rely upon a specific contract. In October, he solicited and obtained a reduction of five cents per ton in the price of steam coal. Later, he took Richmond's proposition of $1.50 and $2.00 per ton under consideration, agreeing to submit it to the officers of his company. He requested his attorney to prepare a written contract, providing a price greatly in excess of that agreed upon in May and October, which was done, and the contract was submitted to the offices of appellant, but not signed.

It is persuasively argued by counsel for appellee that the obvious necessities of appellee were such as to imperatively require a definite arrangement for a supply of coal. The variety of its business called for a constant supply of large quantities thereof, and without coal it could serve none of its customers with light, power, or heat, and the consequence of its failure to

supply heat particularly to the business district for the use of its customers having business or residing in the vicinity of the square in Albia would be of such a serious character as to practically compel appellee to have an early, definite, and positive arrangement for a constant supply of coal at a reasonable price. Conceding the force of this argument, it cannot overcome the positive testimony of the witness, or disprove the circumstances revealed thereby. There is nothing in the record showing that a shortage of coal or a material increase in price was probable until late in the season. Boyer's attitude on the subject of the alleged oral contract was hardly consistent with his own version thereof. If he understood and believed that such a contract existed, he evinced little or no disposition to demand its fulfillment, notwithstanding the fact that the proposed increase in price was substantial. It was he who first sought a modification of the agreement as to price. Later, he discussed the proposed increase in price with the officers of appellant, without mentioning or asserting a claim that the price was settled until April 1, 1917, by the solemn agreement of the parties.

It is urged that Morrow admitted that an oral contract was entered into in May. It is true that Morrow so admitted upon the trial; but, if we accept his version of the contract, it was fully performed before this action was commenced. A contract which is uncertain or indefinite in its terms is not susceptible of compulsory specific performance. The real question for decision in this case is: Does the record disclose such facts as that we can say therefrom that the alleged contract is clearly and satisfactorily proved? Boyer claimed at different times, according to the testimony of Morrow and other witnesses, that he could buy coal cheaper than he was getting it of appellant, and that he was inclined to buy it of a syndicate, or arrange to get it from Centerville. This is denied by Boyer. The credible testimony of the several witnesses is, so far as we can see, as favorable to the contention of appellant as to that of appellee. We are unable to find that the preponderance thereof favors the latter.

The earnestness of counsel has caused us to re-examine the record with the greatest care, and we have endeavored to state the facts as favorably to appellee as the record will stand. We find nothing to indicate that the witnesses upon one side are

more credible than those upon the other. There is a direct conflict in the testimony upon the vital question of fact. It is urged that weight should be given to the finding of the trial court because of the advantage of seeing and hearing the witnesses testify. Whatever weight we do and should give the finding of the trial court, in a case triable *de novo* in this court we cannot abdicate our function as an appellate court, empowered to try the case anew, and simply affirm the judgment in the lower court. The evidence must be of such a character as to convince this court. We are not convinced that our former holding was wrong. On the contrary, a re-examination of the record confirms us in the conclusion then reached that appellee failed to make out a case for specific performance by that degree of proof required in such cases. As bearing somewhat upon the question of specific performance of contracts of the character here involved, see *Wickham & Burton Coal Co. v. Farmers Lbr. Co.*, 189 Iowa 1183.

It follows that the decree and judgment of the court below are—*Reversed.*