# IN THE SUPREME COURT OF IOWA

No. 14–0178

Filed May 29, 2015

Amended July 30, 2015

**DANNY HOMAN, STEVEN J. SODDERS, JACK HATCH, PAT MURPHY,** and **MARK SMITH,**

> Appellees,

vs.

**TERRY BRANSTAD,** Governor, State of Iowa, and **CHARLES M. PALMER,** Director, Iowa Department of Human Services,

> Appellants.

---

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

The Governor and the director of the department of human services appeal from the district court's grant of a temporary injunction prohibiting them from closing the Iowa Juvenile Home. **REVERSED AND REMANDED WITH INSTRUCTIONS.**

Thomas J. Miller, Attorney General, Jeffrey S. Thompson, Solicitor General, Meghan L. Gavin and Timothy L. Vavricek (until withdrawal), Assistant Attorneys General, for appellants.

Mark T. Hedberg, Nathaniel R. Boulton, and Sarah M. Wolfe of Hedberg & Boulton, P.C., Des Moines, for appellees.

**MANSFIELD, Justice.**

During the 2013 legislative session, the Iowa General Assembly appropriated funds for the operation of the Iowa Juvenile Home (IJH) in Toledo for the 2014 fiscal year (July 1, 2013 to June 30, 2014). Approximately five months into that fiscal year, the Iowa Department of Human Services (DHS) decided to close the home and find alternative, judicially approved placements for the twenty-one girls who resided there.

Two state senators, two state representatives, and the president of the labor organization representing employees at the IJH filed suit against the Governor and the director of DHS. In addition to other relief, the plaintiffs sought a determination that the defendants' refusal to spend appropriated funds to continue operating the IJH was unconstitutional. Agreeing with the plaintiffs, the district court entered a temporary injunction preventing closure of the IJH.

The Governor and the DHS director sought interlocutory review of this injunction. We granted their request and stayed the injunction pending appeal. Meanwhile, the general assembly declined to fund ongoing operations of the IJH for the 2015 fiscal year (July 1, 2014 to June 30, 2015).

The Governor and the DHS director raise several arguments as to why the injunction was wrongly entered. The plaintiffs, on the other hand, contend the injunction was properly granted. We decline to reach either side's arguments. Instead, we determine the case is moot because the legislature is no longer appropriating funds for the operation of the IJH. Accordingly, we reverse the judgment of the district court and remand with instructions to dismiss the case as moot.

## I. Background Facts and Proceedings.

On June 20, 2013, subject to exceptions not relevant here, the Governor approved an act of the general assembly appropriating funds for health and human services for the 2014 fiscal year running from July 1, 2013 to June 30, 2014. *See* 2013 Iowa Acts ch. 138. Section 17 of the act included, in part, an appropriation to DHS for the continued operation of the IJH:

> Sec. 17. JUVENILE INSTITUTIONS. There is appropriated from the general fund of the state to the department of human services for the fiscal year beginning July 1, 2013, and ending June 30, 2014, the following amounts, or so much thereof as is necessary, to be used for the purposes designated:
>
> 1. For operation of the Iowa juvenile home at Toledo and for salaries, support, maintenance, and miscellaneous purposes, and for not more than the following full-time equivalent positions:
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 8,859,355
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . FTEs 114.00

*Id.* ch. 138, § 17.

On August 20, 2013, responding to reports of improper use of seclusion and restraint at the IJH, the Governor issued Executive Order 82, which created the Iowa Juvenile Home Protection Task Force. *See* Exec. Order No. 82 (2013), *available at* https://governor.iowa.gov/sites/default/files/documents/Executive-Order-82.pdf. The executive order noted, among other things, that "protecting the health, safety and welfare of Iowa's children is of the utmost importance," and "all Iowa children deserve the best care and education we can provide." *Id.* The executive order directed DHS to conduct "trauma-informed care training" for IJH staff within thirty days. *Id.* In addition, the executive order charged the task force with the following responsibilities:

a. Make recommendations about how to improve services for [IJH] residents;

b. Review incident data to ensure a high-level of care is delivered at the Iowa Juvenile Home;

c. Recommend a strategy for the permanent elimination of seclusion rooms outside the cottage setting;

d. Recommend a strategy outlining the transition of the Iowa Juvenile Home's education plan from being managed from the Department of Human Services to Area Education Agency 267; and

e. Reach other goals and objectives as requested by the Office of the Governor.

*Id.* The task force was directed to "report its findings and make them available to the public no later than October 15, 2013." *Id.*

Despite this tight time schedule, the IJH task force issued its report to the Governor on October 9.[1] Iowa Juvenile Home Protection Task Force, Report of the Iowa Juvenile Home Protection Task Force (Oct. 9, 2013), *available at* https://dhs.iowa.gov/sites/default/ files/Report%20of%20the%20Iowa%20Juvenile%20Home%20Protection %20Task%20Force.pdf. The task force stated it had undertaken its investigation "with one over-riding goal: to make recommendations guided solely by the best interests of Iowa's youth." *Id.* (cover letter). The task force made several findings. Among other things, it criticized the housing of two separate populations of girls at the IJH—namely, girls who had been adjudicated delinquent and girls who had been adjudicated children in need of assistance (CINA). *Id.* at 2. Also, the task force found the IJH's physical plant "is, in many respects, outdated and unsuitable for the use to which the IJH is put." *Id.* Additionally, it noted that the IJH's control rooms "have an extreme 'prison-like'

---

[1]The plaintiffs cited and discussed the IJH task force report in their petition but did not attach a copy. We take judicial notice of the report's actual contents. *See King v. State*, 818 N.W.2d 1, 6 & n.1 (Iowa 2012) (taking judicial notice of reports and studies referenced in the plaintiffs' petition and citing authority for doing so).

appearance and contribute to the creation of the 'corrections culture' that was prevalent at the [IJH] in the past." *Id.* The report also observed that private placements could enable the CINA youth to benefit from federal funding and would allow both the CINA youth and the delinquent youth to receive additional services upon reaching eighteen years of age. *Id.* at 4.

The task force then made a series of recommendations based on "the best interests of the youth." *Id.* at 4–7. Among other things, the task force advised that CINA girls no longer be admitted to the IJH. *Id.* at 6. Further, it recommended that *if* delinquent girls are to be placed at the IJH, "the cottages currently on the campus should be replaced with living units that are designed per current standards . . . and with seclusion rooms in the living units themselves." *Id.* at 5.

Thus, the task force did not specifically recommend the closure of the IJH, but did recommend that the IJH stop admitting CINA girls and that the existing residences for delinquent girls be replaced if the IJH continued to serve delinquent girls.

Two months later, on December 9, the director of DHS announced his decision to find alternative placements for IJH residents and to shutter the IJH. The director stated his decision was "based on recommendations from the Iowa Juvenile Home Protection Task Force." The director's announcement pointed out that the IJH currently served a total of twenty-one girls, including eleven delinquent girls, nine girls who had been adjudicated CINA, and one girl who was being evaluated.

The director further observed that while "[n]ew methods of de-escalating behavior [had] resulted in a 93 percent reduction in the use of seclusion measures" at the IJH, it would be preferable to work with other facilities and community-based providers "who can offer a variety of

services and supports which would not be available on the Toledo campus if it were serving only a very small number of delinquent girls." (internal quotation marks omitted). The director offered his view that the girls currently in the IJH "will be served most successfully through court-approved alternative placements." (internal quotation marks omitted). The director added that employee layoffs at the IJH would occur effective January 16, 2014.

On January 2, AFSCME Iowa Council 61 President Danny Homan, Senator Steven J. Sodders, Senator Jack Hatch, Representative Pat Murphy, and Representative Mark Smith filed this action in Polk County District Court against the Governor and the DHS director. AFSCME Iowa Council 61 is the state branch of the American Federation of State, County, and Municipal Employees and represents public employees in Iowa, including the staff at the IJH. Sodders, Hatch, Murphy, and Smith were members of the Iowa General Assembly when the suit was filed.

The petition alleged that the Governor's decision disallowing the spending of the $8,859,355 that had been legally appropriated to the operation of the IJH for fiscal year 2014 exceeded his constitutional authority. The plaintiffs also alleged that the defendants had exceeded the recommendations of the task force, which they contended "at no point suggested the closing of the Iowa Juvenile Home at Toledo." The plaintiffs did not allege that any provision of Iowa law apart from the 2014 appropriation required the defendants to keep the IJH open.

The plaintiffs sought (1) a declaration that the "refusal to allow the spending of funds appropriated . . . is an unconstitutional impoundment," (2) an injunction preventing the closure of the IJH, and (3) a writ of mandamus ordering the IJH to remain open.

On January 10, the plaintiffs filed an application for a temporary injunction. The application asserted the defendants' impoundment of appropriated funds would result in irreparable harm to the plaintiffs. The plaintiffs sought a temporary injunction restraining the defendants from closing the IJH. An accompanying brief explained that the defendants' actions had violated article IV, section 9 of the Iowa Constitution, which provides the Governor "shall take care that the laws are faithfully executed." Iowa Const. art. IV, § 9.

The Governor and the DHS director moved to dismiss the petition on January 21. They asserted the plaintiffs lacked standing and had failed to state a claim upon which relief could be granted. The defendants also resisted the application for temporary injunction, arguing the plaintiffs had not met the standards for such an injunction because "the language of the appropriation at issue, coupled with the statutory discretion afforded the executive branch to manage the budget, provides no legal basis upon which a court could determine that there has been an [unconstitutional] impoundment of funds." The defendants also contended that the plaintiffs had not established irreparable harm.

The plaintiffs, meanwhile, argued that plaintiff Homan had standing as the president of the union representing bargaining-unit employees at the IJH; that plaintiffs Sodders, Hatch, Murphy, and Smith had standing as legislators; and that all five plaintiffs had standing as residents, taxpayers, and citizens. The plaintiffs also maintained that the defendants' actions amounted to an unconstitutional impoundment of funds in violation of article IV, section 9 of the Iowa Constitution. A supporting affidavit from Homan explained that the closure of the IJH had adversely affected union members because it had resulted in job losses.

A hearing on the motion to dismiss and the application for temporary injunction took place on January 31. The plaintiffs did not present any additional evidence at the hearing. The defendants introduced several exhibits, two of which were affidavits from DHS officials.

First, an affidavit from DHS's chief financial officer stated that as of January 8, the department had spent $3,675,150 of the $8,859,355 maximum appropriated for the IJH for the fiscal year ending on June 30. The affidavit also indicated that for the remainder of the fiscal year, the department would expend an estimated $2,297,187 "to pay for ongoing maintenance and infrastructure support" at the home, despite the decision to close it.

Second, DHS also submitted an affidavit from its division administrator for field operations. She stated that she was involved in the placement recommendations for children who were relocated as a result of the closing of the IJH. She explained that juvenile court approval was required before any placement recommendation was implemented, and most of the children who had been housed at the IJH were transferred to less restrictive levels of care.

Lastly, the defendants offered several documents relating to the collective bargaining relationship between AFSCME Iowa Council 61 and DHS. These were a copy of the parties' collective bargaining agreement; the grievance filed by Homan with DHS over closure of the IJH; and a memorandum of understanding between AFSCME Iowa Council 61, DHS, and others concerning transfer rights for employees who had been impacted by the layoffs resulting from the closure of IJH.

The district court issued its ruling and order on February 5. It denied the defendants' motion to dismiss and granted the plaintiffs'

request for a temporary injunction. As an initial matter, the court concluded the plaintiffs had standing:

> Plaintiff Danny Homan is the President of the American Federation of State, County, and Municipal Employees ("AFSCME") Iowa Council 61. . . . 93 members of the AFSCME Iowa Council 61 who worked at the Iowa Juvenile Home in Toledo were laid off following the closure of [the] facility. Therefore, the members have suffered an injury as a result of the Defendants' actions, and Danny Homan has standing as the President of AFSCME Iowa Council 61 to represent their interests.
>
> . . . The Plaintiff legislators have alleged that the Defendants' decision to close the facility frustrated legislative intent and constituted an impoundment of appropriated funds in violation of Article IV Section 9 of the Iowa Constitution ("He shall take care that the laws are faithfully executed."). Therefore, the Plaintiff legislators have been injured by the Defendants' actions, and have standing in this case to protect the effectiveness of their votes.

On the merits, the court then determined a temporary injunction was appropriate:

> The Court finds that the facts and circumstances of this case support the burden of proof required by the Plaintiffs seeking the preliminary injunction. First, Plaintiffs are entitled to relief because the actions of the Defendants constitute an act or omission that would greatly and irreparably injure the Plaintiffs. In addition, it appears the Defendants are threatening to do or have, in fact, already committed an act which violates the Plaintiffs' rights: the ignoring or contravention of a duly enacted law of the Iowa Legislature.

The court went on to state that it considered the case likely to succeed on the merits because "the actions of the Defendants, and, in particular, the Governor of the State of Iowa, allowing an appointee to unilaterally frustrate and, in effect, change the laws as duly enacted by the Iowa Legislature cannot be allowed." It elaborated:

> If the Department of Human Services and the Toledo facility could operate with some amount less than the $8,859,355.00 appropriated, so be it. But to totally

eliminate the operations of the Toledo Home under the guise of the language "or so much thereof as is necessary" is to essentially ignore the laws of the State of Iowa as enacted lawfully by the General Assembly and allows the Executive branch to unilaterally decide which laws it will obey and which laws it will not.

We granted the defendants' application for interlocutory appeal on February 21. At the same time, we stayed the district court proceedings and the temporary injunction.

During the 2014 legislative session that ended May 2, the legislature adopted and the Governor subsequently approved the following appropriation for the IJH:

> Sec. 147. JUVENILE INSTITUTIONS. There is appropriated from the general fund of the state to the department of human services for the fiscal year beginning July 1, 2014, and ending June 30, 2015, the following amounts, or so much thereof as is necessary, to be used for the purposes designated:
>
> 1. For ~~operation of~~ <u>the costs of security, building and grounds maintenance, utilities, salary, and support for the facilities located at</u> the Iowa juvenile home at Toledo and for salaries, support, maintenance, and miscellaneous purposes, and for not more than the following full-time equivalent positions:
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $     ~~4,429.678~~
>
>            507,766
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . FTEs    ~~114.00~~
>
>            2.00

2014 Iowa Acts ch. 1140, § 147.[2]

---

[2]The Governor line-item vetoed a proviso which stated, *"The full-time equivalent positions authorized by this subsection, as amended by this 2014 Act, are intended to be filled by the maintenance staff persons performing such duties at the time the Iowa juvenile home was closed in January 2014."* 2014 Iowa Acts ch. 1140, § 147.

**II. Standard of Review.**

The parties disagree whether the plaintiffs have standing to sue. *Compare Godfrey v. State*, 752 N.W.2d 413, 417, 423–24, 428 (Iowa 2008) (finding a citizen–taxpayer lacked standing to bring a claim that the legislature's enactment of a law violated the single-subject rule of the Iowa Constitution), *with Rants v. Vilsack*, 684 N.W.2d 193, 198 (Iowa 2004) (indicating citizen–taxpayers had standing to challenge the constitutionality of the Governor's line-item vetoes).

The parties also disagree on the merits—namely, whether the Governor and the director of DHS could lawfully stop spending money to operate the IJH. *See* Op. Iowa Att'y Gen. No. 80-8-8 (Aug. 11, 1980), 1980 WL 26040, at *6 (providing the attorney general's views as to when the executive withholding of funds would and would not be constitutional). *Compare Felicetti v. Sec'y of Cmtys. & Dev.*, 438 N.E.2d 343, 344 (Mass. 1982) (finding executive impoundment of funds unlawful), *and Cnty. of Oneida v. Berle*, 404 N.E.2d 133, 138 (N.Y. 1980) (same), *with Pennsylvania v. Lynn*, 501 F.2d 848, 851, 854–56 (D.C. Cir. 1974) (upholding the executive's decision not to spend appropriated funds), *and N.H. Health Care Ass'n v. Governor*, 13 A.3d 145, 157–58 (N.H. 2011) (upholding the Governor's decision to spend less than the amount that had been appropriated).[3]

We review questions of standing for correction of errors at law. *Godfrey*, 752 N.W.2d at 417. We review claims of state constitutional violations de novo. *Id.* Review of the issuance of a temporary injunction is for an abuse of discretion. *State v. Krogmann*, 804 N.W.2d 518, 523 (Iowa 2011).

---

[3]Much of this caselaw was discussed in the district court's thorough ruling.

Here, however, we confront a threshold question—whether the litigation is now moot because, in the 2014 legislative session, the legislature ended appropriations for the operation of the IJH. "It is our duty on our own motion to refrain from determining moot questions." *Albia Light & Ry. Co. v. Gold Goose Coal & Mining Co.*, 176 N.W. 722, 723 (Iowa 1920), *aff'd on reh'g*, 192 Iowa 869, 185 N.W. 571 (1921).

**III. Mootness.**

Courts exist to decide cases, not academic questions of law. For this reason, a court will generally decline to hear a case when, because of changed circumstances, the court's decision will no longer matter. This is known as the doctrine of mootness.

"A case is moot if it no longer presents a justiciable controversy because the issues involved are academic or nonexistent." *Iowa Bankers Ass'n v. Iowa Credit Union Dep't*, 335 N.W.2d 439, 442 (Iowa 1983). In *Iowa Bankers Association*, we dismissed as moot the portion of an appeal that challenged certain administrative rules. *Id.* During the pendency of the appeal, the general assembly had passed legislation directing the agency to issue new rules, and the challenged rules had been rescinded. *Id.*

"Our test is whether an opinion would be of force and effect with regard to the underlying controversy." *Women Aware v. Reagen*, 331 N.W.2d 88, 92 (Iowa 1983). In *Women Aware*, a case with some similarities to the one at hand, the legislature had enacted the following provision as part of a two-year appropriation:

> It is the intent of the general assembly that the schedule of living costs and the payment for persons on the aid to dependent children program shall be increased for all family sizes by six percent commencing October 1, 1979 and by an additional six percent commencing October 1, 1980.

*Id.* at 90 (quoting 1979 Iowa Acts ch. 8, § 10(1)). However, in response to a budget shortfall, the department of social services indefinitely deferred the six percent increase that was to begin October 1, 1980. *Id.* at 89. Plaintiffs sought administrative and judicial relief on the ground that the department's action violated the separation of powers, and was ultra vires, unreasonable, arbitrary, and capricious. *Id.* at 90. The district court denied relief, and plaintiffs appealed. *Id.*

Meanwhile, though, the legislature retroactively amended the appropriation to delete the six percent increase beginning October 1, 1980. *Id.* We found the case moot, reasoning, "The legislature's retroactive repeal of the original statute providing for the benefit increase precludes recovery by petitioners and obviates any necessity to resolve the other issues raised." *Id.* at 93.

In *Wengert v. Branstad*, the plaintiffs challenged a line-item veto striking the words "minimum security" from certain appropriations. 474 N.W.2d 576, 577 (Iowa 1991). The Governor initially fought the lawsuit, but ultimately agreed to a decree that enjoined him from spending the appropriated money for any purpose other than minimum-security facilities. *Id.* We determined that the trial court had properly decided the case was moot. *Id.* at 579. As we put it,

> Our lawgiving function is carefully designed to be an appendage to our task of resolving disputes. When a dispute ends, the lawgiving function ordinarily vanishes because it is axiomatic that we ordinarily do not answer academic or moot questions. We certainly should not go out of our way to answer a purely moot question because of its possible political significance. We regularly decline to address constitutional questions unless their answers are necessary to dispose of the case. . . .
>
> . . . .
>
> A pronouncement on the merits of plaintiffs' challenge in this case would cast no light, would in no way expand,

> develop, or refine the understanding of the governor's veto authority. It would serve only to state officially who was right and who was wrong. The governor's consent to expend the appropriated funds in accordance with the demands in plaintiffs' petition ended all practical aspects of the dispute. This rendered plaintiffs' challenge academic. The trial court was correct in so holding.

*Id.* at 578–79 (citation omitted).

We believe this case is likewise moot. The plaintiffs did not seek any monetary relief, only a declaratory judgment and a court order barring the closure of the IJH. During the 2014 legislative session, the legislature decided to close the IJH. *See* 2014 Iowa Acts ch. 1140, § 147.[4] Our resolution of the present case will not affect that outcome.

One of our neighboring state supreme courts has applied the mootness doctrine to an impoundment case. *W. Side Org. Health Servs. Corp. v. Thompson*, 404 N.E.2d 208, 209–10 (Ill. 1980). In that case, the Illinois legislature had appropriated money for drug-abuse treatment services. *Id.* at 209. The Governor, citing budgetary concerns, ordered part of the funds to be withheld. *Id.* The plaintiffs sued to force the Governor to expend the full appropriation. *Id.* State law, however, provided that all appropriations automatically lapsed no later than three

---

[4]The appropriations act for the 2015 fiscal year set a greatly reduced budget for the IJH—covering only preservation and protection of the building and grounds. *See* 2014 Iowa Acts ch. 1140, § 147 (stating the diminished budget of $507,766 was for "the costs of security, building and grounds maintenance, utilities, salary, and support for the facilities"). Thus, an injunction to keep the IJH open and operating—even if supported by the 2014 fiscal year appropriation, which has now expired—would be contrary to the 2015 fiscal year appropriation. As noted, the plaintiffs do not allege that any provision of law, other than the now-expired 2014 appropriation, required the continued operation of the IJH.

Although the appropriation for the 2015 fiscal year had not yet occurred at the time the district court granted the temporary injunction, we are permitted to consider matters that have transpired during the appeal for the purpose of determining whether a matter is moot. *See Iowa Mut. Ins. Co. v. McCarthy*, 572 N.W.2d 537, 539 n.1 (Iowa 1997). Additionally, courts may take judicial notice of legislative proceedings. *See Socony Vacuum Oil Co. v. State*, 170 N.W.2d 378, 382 (Iowa 1969).

months after the end of the fiscal year. *Id.* at 209–10. Despite the expiration of this time period, the intermediate appellate court reached the merits and found the Governor lacked authority to impound the funds. *Id.* at 209. The Illinois Supreme Court reversed on the ground the case had become moot. *Id.* at 211. That court observed,

> [W]here no actual rights or interests of the parties remain or where events occur which render it impossible for the reviewing court to grant effectual relief to either party, the issues raised by the litigation should not be resolved merely to establish a precedent or to govern potential future cases.

*Id.* at 210.

Notwithstanding the Illinois Supreme Court's decision, there is some federal appellate authority that courts have "the power to order that [appropriated] funds be held available beyond their statutory lapse date if equity so requires." *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 184 (D.C. Cir. 1992) (internal quotation marks omitted).

> Budget authority lapse provisions impose deadlines that require agencies to obligate funds within a specified period. That period may be extended in the rare circumstance where the extension will serve the interests of justice and the ends Congress sought to bring about.

*Id.* But federal courts do not have authority to restore an appropriation that Congress has elected to rescind. *See id.* at 185. Thus, in *Rochester Pure Waters District*, the United States Court of Appeals for the District of Columbia reversed an injunction entered by the lower court, holding "the budgetary lapse cases do not control a situation in which Congress rescinds appropriations with full knowledge of pending claims." *Id.* at 186.

Previously, in Iowa, we have not extended the expiration date of an appropriation on equitable grounds when there is a pending lawsuit between the legislative branch and the executive branch concerning that

appropriation. *See Colton v. Branstad*, 372 N.W.2d 184, 187 (Iowa 1985) (indicating a line-item veto controversy became moot when the appropriation expired at the end of the fiscal year); *Rush v. Ray*, 332 N.W.2d 325, 326 (Iowa 1983) (same). But even if we determined we had that authority, the principles of *Rochester Pure Waters District* would govern here. The judicial branch does not have authority to order state officials to keep the IJH open based on a prior fiscal 2014 appropriation when the legislative branch expressly decided not to appropriate funds for the facility's operation in fiscal 2015. Otherwise stated, this case is definitely moot.

Even if a case is moot, we may nonetheless choose to decide it under certain circumstances. The potentially relevant exception here is the so-called public-importance exception: "An exception to the general rule [against deciding moot cases] exists where matters of public importance are presented and the problem is likely to recur." *In re Guardianship of Kennedy*, 845 N.W.2d 707, 711 (Iowa 2014) (internal quotation marks omitted). We consider four factors in determining whether we should exercise our discretion to decide a moot action under this exception:

> "(1) the private or public nature of the issue; (2) the desirability of an authoritative adjudication to guide public officials in their future conduct; (3) the likelihood of the recurrence of the issue; and (4) the likelihood the issue will recur yet evade appellate review."

*Maghee v. State*, 773 N.W.2d 228, 234 (Iowa 2009) (quoting *State v. Hernandez-Lopez*, 639 N.W.2d 226, 234 (Iowa 2002)).

For example, we exercised our discretion to decide an otherwise moot case under the public-importance exception in *Maghee*. *Id.* at 235. In that case, the petitioner had filed an application for postconviction

relief challenging the revocation of his work release, but had died while the case was on appeal. *Id.* at 230–31. We noted the petitioner's death rendered the case moot, but nevertheless decided to reach the merits of the appeal based on the public-importance exception. *See id.* at 235. We concluded the exception was warranted under the four-prong test set forth above:

> [T]he present appeal presents an issue of general applicability that is likely to reoccur. Prisoners are transferred in and out of work release every day, and challenges to such transfers inevitably arise. Certainly, it is desirable to have an authoritative adjudication as to whether such challenges should be pursued as judicial review of agency action under chapter 17A or by filing a postconviction-relief action under chapter 822. Public officials as well as prisoners would benefit from such guidance. In addition, due to the effect of earned-time credits, work release, and parole, it is likely many actions similar to the one brought by Maghee could be rendered moot by the inmate's release prior to the resolution of an appeal . . . .

*Id.*

In *Guardianship of Kennedy*, we also found the public-importance exception applied. 845 N.W.2d at 711. There, both parties urged us to decide whether sterilization of a male ward required advance court approval, even though the sterilization had already occurred. *Id.* at 710–11. We found the issue was likely to recur. *Id.* at 711. In addition, while it might be possible for the issue to reach an appellate court in a future nonmoot case, the circumstances would be "less than ideal." *Id.* Either the ward would suffer prolonged uncertainty while the case was being decided or he would already have been sterilized and would be seeking only collateral relief. *Id.*; *see also In re B.B.*, 826 N.W.2d 425, 428–29 (Iowa 2013) ("[O]ne exception [to the mootness rule] permits

appellate review of otherwise moot issues when the issue is one of broad public importance likely to recur.").

In *Hernandez-Lopez*, we were confronted with both facial and as-applied challenges to the Iowa statute that allows material witnesses to be held pending trial. 639 N.W.2d at 232. The State sought to dismiss the entire appeal as moot because the witnesses were no longer in state custody. *Id.* at 233. We applied the public-importance exception in order to hear the defendants' *facial* challenge to the statute, explaining:

> Our appellate courts have not yet interpreted section 804.11, and a decision would provide guidance to law enforcement personnel and judicial officers faced with similar situations in the future. It is a virtual certainty that another individual will be arrested under this statute. Most importantly, we believe this is a case capable of repetition, yet evading appellate review. Considering the time for processing an appeal, in addition to the relatively short duration of detentions under section 804.11, a detainee will often be released from custody before an appellate court can reach the issue.

*Id.* at 235 (citations omitted). At the same time, we declined to address the defendants' *as-applied* challenges that related to the specific circumstances of their case. *Id.*

Clearly, the issue raised by this case is one of public importance. In another area involving the limits of executive branch authority, namely, the line-item veto, we have on several occasions applied the public-importance exception to mootness, deciding to hear cases even after the term of the affected appropriations expired. Thus, in *Rush*, we reversed a trial court's dismissal of an action challenging a line-item veto, reasoning that "the question should have been considered under the public interest exception." 332 N.W.2d at 327. There we emphasized, "[I]t seems probable that the vetoed language, or language calling for the suspension of the operation of some other statute, might

be similarly placed in another appropriations bill." *Id.*; *see also Junkins v. Branstad*, 421 N.W.2d 130, 134 (Iowa 1988) (finding a line-item veto case not moot but also disagreeing with the district court's determination that the public-interest exception did not apply); *Colton*, 372 N.W.2d at 187 (applying the public-importance exception to mootness in a line-item veto case). *But see Wengert*, 474 N.W.2d at 578–79 (declining to decide a moot line-item-veto case under the public-importance exception).

Yet this case is different. We have seen line-item-veto cases with some regularity since the Governor was given line-item veto authority by a 1968 constitutional amendment. *See* Iowa Const. art. III, § 16; *see also, e.g., Homan v. Branstad*, 812 N.W.2d 623, 629–30 (Iowa 2012) (citing cases). By contrast, a computer-aided review of this court's 175 years of caselaw does not reveal any previous case where we were called upon to interpret article IV, section 9 of the Iowa Constitution—let alone decide the constitutionality of an impoundment. We are not persuaded that the question of the Governor's impoundment authority will recur any time soon.

If it does recur, it is likely to be framed somewhat differently. Some of the defendants' arguments in this case focus on the specific language used in the 2014 appropriation—"or so much thereof as is necessary." 2013 Iowa Acts ch. 138, § 17. Additionally, the defendants maintain they are obligated here to follow directives in Iowa Code chapter 232. *See, e.g.*, Iowa Code § 232.1 (2013) ("When a child is removed from the control of the child's parents, the court shall secure for the child care as nearly as possible equivalent to that which should have been given by the parents."); *id.* § 232.52(1) (requiring for delinquent youth "the least restrictive dispositional order appropriate in view of the seriousness of the delinquent act"); *id.* § 232.102(7) (requiring the disposition for CINA

youth to "serve the best interests of the child"). Both sides invoke the report of the IJH task force. We are not saying these arguments are or are not valid grounds for closing the IJH, just that they might make it difficult to draw lessons from a decision on the merits of this case, if we were to render such a decision.

Perhaps most importantly, the general assembly clearly could have kept this case alive if it had appropriated funds for the continued operation of the IJH during the 2014 legislative session (and if necessary, overridden the Governor's veto). Instead, the legislative branch, in effect, acquiesced in the executive branch's action while the case was pending. *Cf. Belfanti v. Casey*, 596 A.2d 298, 302 (Pa. Commw. Ct. 1991) (finding no impoundment of funds where the Governor closed a state hospital and the legislature thereafter appropriated no funds for its continued operation). In a sense, this case presents the other side of the coin from *Wengert*, where the Governor effectively backed down from his previous line-item veto while the case was pending, and on that basis we declined to hear the case. *Cf.* 474 N.W.2d at 577, 579.

We recognize the decision to close the IJH was a controversial one, with effects not only on the youth who lived there but also on the individuals in Toledo and surrounding communities who worked there. Yet we owe great respect to the two other coequal branches of government. Part of that respect involves not telling them what they can and cannot do unless the answer is likely to matter in this or a future case. For all the reasons stated, we conclude the temporary injunction should be vacated and the underlying action dismissed as moot. *See, e.g., Douglass v. Iowa City*, 218 N.W.2d 908, 914 (Iowa 1974) (finding an injunction "unwarranted insofar as it is based on" a moot ground).

**IV. Conclusion.**

For the reasons stated, we determine that this action is moot and that the public-importance exception does not justify our hearing an otherwise moot case. We reverse and remand to the district court with instructions to dismiss the case. Costs on appeal are taxed one-half to the plaintiffs and one-half to the defendants.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**