**IN THE COURT OF APPEALS OF IOWA**

No. 19-0268
Filed September 11, 2019

**IN THE MATTER OF THE GUARDIANSHIP AND CONSERVATORSHIP OF SYLVIA M. OLSON,**

**RICHARD MAGNUSON,**
     Appellant.

_____

Appeal from the Iowa District Court for Woodbury County, Zachary Hindman, Judge.

Richard Magnuson appeals the ruling of the district court approving the annual report of Sylvia Olson's guardian and conservator. **AFFIRMED.**

R. Scott Rhinehart of Rhinehart Law, P.C., Sioux City, for appellant.

Richard H. Moeller of Moore, Heffernan, Moeller, Johnson & Meis, L.L.P., Sioux City, for appellee.

Considered by Vaitheswaran, P.J., and Doyle and Bower, JJ.

**DOYLE, Judge.**

Sylvia Olson is the mother of Richard Magnuson, Bob Magnuson, and Lori Kurtz.  In 2013, Sylvia voluntarily petitioned for the appointment of Lori to be her guardian and conservator.  Lori was appointed and served until Sylvia's death in October 2018.

Shortly before the guardianship and conservatorship were opened, Lori moved Sylvia to an apartment in a Sioux City facility.  Lori hired caregivers to care for Sylvia during her waking hours.  At the end of July 2018, Lori filed annual guardian and conservator reports for the period from November 2016 to November 2017.  Among other expenditures, Lori reported many payments to persons labeled as "Caregiver."  The district court noted the amounts paid were "very significant" and requested Lori provide additional information.  Lori then filed a supplemental report explaining Sylvia "receives care approximately 13 hours a day, 365 days a year.  The price per hour ranges from $13 to $23 per hour."  The court found the explanation insufficient, stating,

> The court finds it unusual for an individual to be provided 13 hours per day of non-medical services.  The court finds it unusual for approximately $67,000.00 to be spent on such services in one year.  The court finds it unusual that a substantial portion of these funds expended were paid to individuals, rather than business organizations.

The court did not approve the report.

In the middle of October 2018, Lori applied for authorization to expend conservatorship funds for caregivers and for approval of the conservator's annual report. The matter was set for a hearing in November.  Sylvia passed away at the end of October 2018.

Richard objected to Lori's application. He contended Sylvia had been "incompetent for the last four years and belonged in a skilled care facility with twenty-four hour care." Richard suggested Lori had paid friends exorbitant amounts of money to care for Sylvia and asserted Lori had acted contrary to Sylvia's best interests. He requested Lori's application be denied and that she "be ordered to return all the monies spent improperly and poorly." The district court summarized Richard's objections:

> Richard believes that Sylvia should have received skilled care in a memory care unit; he believes in particular that Sylvia required care from skilled providers all day, every day; he believes that Sylvia required such care for the two years preceding her death; he believes that the care that Lori provided for Sylvia was inadequate because the caregivers Lori hired were not adequately qualified to provide the type of care that he believes Sylvia required; and he believes that the care that Lori provided for Sylvia—by hiring care takers for only part of the day—was not only inadequate, but also was more expensive than would have been the care that Richard believes Sylvia needed.

Following a hearing on Lori's application and the filing of post-hearing briefs, the court overruled all of Richard's objections and approved Lori's application for expenditure of funds and the annual and supplemental conservatorship reports. The court noted several of Richard's objections about the quality of care that Lori's hired caregivers provided—"claims that Lori harmed Sylvia by providing inadequate care, or that the inadequate care that Lori provided contributed to Sylvia's death"—were claims that belonged to Sylvia's estate and should be litigated there, not in the guardianship and conservatorship proceedings. The court rejected the remainder of Richard's objections as lacking merit.

Richard appeals. He summarizes his three issues on appeal as:

> I. Whether part-time daycare for an incompetent person/ward by untrained individuals contrary to prior orders relieves a

guardian/conservator of responsibility under Iowa Code [section 633.635(1)(e)].[1]

    II. Whether untrained and unlicensed persons can legally administer narcotics, painkillers, prescriptions and insert catheters without violating Iowa Code Section 147.107.[2]

    III. Whether promises made to a ward which conflict with Iowa Code [section 633.635(1)(e)] should relieve the fiduciary of complying with Iowa law.

Our review is de novo. *See* Iowa Code § 633.33 (stating that all matters are tried by the probate court in equity other than will contests, involuntary proceedings to appoint guardians or conservators, and establishment of contested claims); *see also In re Roehlke's Estate*, 231 N.W.2d 26, 27 (Iowa 1975) ("A hearing on objections to a fiduciary's final report is an equitable proceeding." (Citations omitted.)); Iowa R. App. P. 6.907. In equity cases, especially when considering the credibility of witnesses, we give weight to the fact findings of the district court, but we are not bound by them. Iowa R. App. 6.904(3)(g).

The gist of Richard's first issue is that Lori spent too much money for inadequate care—she "spent more money than was necessary on part-time daycare instead of qualified full-time medical care." He asserts Lori should have transferred Sylvia to an assisted living facility with skilled care and that Lori's failure to do so was "contrary to prior orders" and a violation of her fiduciary duties. In

---

[1] Iowa Code section 633.635(1)(e) allows a guardian, without prior court approval, to ensure

    the ward receives professional care, counseling, treatment, or services as needed. If necessitated by the physical or mental disability of the ward, the provision of professional care, counseling, treatment, or services limited to the provision of routine physical and dental examinations and procedures under anesthesia is included, if the anesthesia is provided within the scope of the health care practitioner's scope of practice.

[2] Section 147.107(1) prohibits anyone who is not "a pharmacist, physician, dentist, podiatric physician, prescribing psychologist, or veterinarian who dispenses as an incident to the practice of the practitioner's profession" to "dispense prescription drugs or controlled substances."

support of his argument Richard cherry-picks a statement in a letter from Sylvia's physician, Dr. Pallone, and construes that statement to be an "order" that Sylvia needed full-time skilled caregivers.[3]  But Richard ignores the rest of the letter. What the doctor said was:

> I was Sylvia Olson's primary physician from May 20, 2016 until her death on 10/31/18.  At the time I took over her care, she had moderate to severe dementia and severe bone-on-bone osteoarthritis with pain.  She was substantially unable to provide for her basic needs independently at that time and were it not for her daughter's [Lori] substantial efforts to maintain her in elderly housing with a full time aid she would have certainly been in a nursing home or would have had to relocate to live with family.  Relocation is a substantial difficulty in a person with advanced dementia due to the disorienting effects of an unfamiliar environment.  While she was still able to communicate her desires she repeatedly expressed a desire to remain in her own home, a wish that her daughter, Lori Kurtz honored.  I communicated with Lori in Colorado during every office visit with Sylvia and we often discussed Sylvia's care goals and the safest environment for her to be cared in while honoring her expressed desires.  The services which Lori arranged were absolutely necessary for Sylvia's care and safety.  Her main highered [sic] caregiver was instrumental in preventing any serious skin breakdown, falls, injury, adequate nutrition and ensuring medication adherence.  I fully agree that Sylvia needed a full time caregiver and near continuous supervision during this period, . . . and that compared to the costs of a nursing home this was likely substantially less expensive.  At no point was it a concern or suspicion of mine that her daughter Lori was misusing her resources or inadequately providing for the care of her mother.  Indeed she went above and beyond what I see from most family in similar circumstances.

In no way do we construe the doctor's letter to be an "order" that Sylvia should have been cared for by full-time skilled caregivers in an assisted care facility or memory care unit.  So we agree with the district court's assessment the record did not reflect "a need for Sylvia to have been placed in a more restrictive

---

[3] The letter was prepared after Sylvia's death and attached to Lori's amended application for expenditure of conservatorship funds and approval of annual report.

environment—Sylvia's physician, in the letter quoted above, plainly approved of Lori's arrangement."

But for his own testimony that he could have obtained more quality care for Sylvia at a lower price, Richard presented no evidence that the money Lori paid Sylvia's companions and caregivers was out of line. Nor did he present evidence the care Sylvia received was subpar or deficient in any way. The district court found no need to decide "whether it would have been less expensive for Lori to have placed Sylvia in a nursing home or a memory care unit or any other—or any particular—skilled care facility" in view of its conclusion that

> the arrangements that Lori made for Sylvia's care spent Sylvia's money in the way that Sylvia would have spent her own money, had Sylvia been competent to manage her own affairs; that Lori's care arrangement allowed Sylvia to continue to live, until her death, in a setting less restrictive than otherwise would have been necessary, and indeed allowed Sylvia to maintain a lifestyle more similar to her lifestyle before she became incompetent than otherwise would have been possible; and that there was nothing improper about the care that Lori arranged for Sylvia.

As guardian and conservator, Lori was not constrained by her statutory duties to select the cheapest possible living arrangement in order to preserve the value of Sylvia's estate. *Cf. Des Moines Sav. Bank v. Krell*, 156 N.W. 858, 859-60 (Iowa 1916) (holding that although a guardian must preserve the ward's estate, it does not follow that the ward must remain in poverty and privation in order to preserve the estate). After a de novo review, we agree with the district court that Lori did not breach her fiduciary duties. We affirm the court's ruling on the issue.

As for Richard's two other issues, he essentially asks that we issue advisory opinions because the issues are important. But "[o]ur mootness rule requires a claim to be dismissed 'when judgment, if rendered, will have no practical legal

effect upon the existing controversy.'" *Roth v. Reagen*, 422 N.W.2d 464, 466 (Iowa 1988) (quoting *Toomer v. Iowa Dep't of Job Serv.*, 340 N.W.2d 594, 598 (Iowa 1983); *see also Homan v. Branstad*, 864 N.W.2d 321, 328 (Iowa 2015) (explaining it is "our duty on our own motion to refrain from determining moot questions" (citation omitted)). Stated another way, "[a] case is moot if it no longer presents a justiciable controversy because the issues involved are academic or nonexistent." *Homan*, 864 N.W.2d at 328 (citation omitted). "The test is whether the court's opinion would be of force or effect in the underlying controversy." *In re Guardianship of Kennedy*, 845 N.W.2d 707, 710-11 (Iowa 2014) (citation omitted).

Here, the two remaining issues are not justiciable in this appeal; they are both simply academic. Deciding whether untrained and unlicensed persons can legally administer narcotics without violating section 147.107 would not affect the existing controversy. Even if section 147.107 were violated—and the record here is insufficient to make any such determination—a violation of the statute is a serious misdemeanor. Its remedy does not provide for reimbursement to the estate for the payments Lori made to the caregivers. Richard frames the second issue as "whether the needs of a demented older person outweighs their prior expressed wishes when they were mentally stronger." As to this issue, having already determined Lori did not breach any of her fiduciary duties, it follows that Lori's keeping her promise to Sylvia never to put Sylvia in a nursing home did not conflict with her section 633.635(1)(e) duties. Deciding whether "a guardian/conservator [can] sidestep the directives of [section 633.635(1)(e)] by fulfilling prior requests/promises made and allow the ward to receive sub-adequate care just to stay out of assisted living or a nursing home" would therefore not affect

the existing controversy.  Under these circumstances, dismissal of the remaining two claims for mootness is warranted.  *See Knauss v. Kemin Indus., Inc.*, 267 N.W.2d 56, 57 (Iowa 1978).

Upon our de novo review, we affirm the district court's ruling in all respects and dismiss Richard's claims II and III as moot.  Any costs on appeal are assessed to Richard.

**AFFIRMED.**